[Cite as *State v. Cundiff*, 2011-Ohio-3414.]

IN THE COURT OF APPEALS OF MONTGOMERY COUNTY, OHIO

STATE OF OHIO                    :

    Plaintiff-Appellee       :     C.A. CASE NO. 24171

vs.                              :     T.C. CASE NO. 09CR3259

JAMES MARSHALL CUNDIFF          :     (Criminal Appeal from
                                       Common Pleas Court)
    Defendant-Appellant      :

. . . . . . . . .

O P I N I O N

Rendered on the 8th day of July, 2011.

. . . . . . . . .

Mathias H. Heck, Jr., Pros. Attorney; Kirsten A. Brandt, Asst. Pros. Attorney, Atty. Reg. No.0070162, P.O. Box 972, Dayton, OH 45422
    Attorney for Plaintiff-Appellee

J. Allen Wilmes, 4428 North Dixie Drive, Dayton, OH 45414
    Attorney for Defendant-Appellant

. . . . . . . . .

GRADY, P.J.:

{¶ 1} Defendant, James Cundiff, appeals from his convictions for multiple counts of aggravated robbery and felonious assault, with repeat violent offender specifications, abduction, aggravated menacing and aggravated trespass charges. These offenses arose from Defendant's separate attacks on three women.

{¶ 2} On August 28, 2009, a man robbed Shannon George and slashed her arm and breast with a knife at the rear of a building next to Denny's on South Main Street in Dayton. The assailant was a tall African-American male, wearing a green shirt, black pants, black shoes, and a yellow hospital mask over his nose and mouth. The knife had a short blade and a ring on the handle. After the attack, George ran toward Main Street in the direction of Miami Valley Hospital where she obtained help. On October 28, 2009, George identified Defendant Cundiff from a photospread as her assailant.

{¶ 3} On September 29, 2009, at 11:00 p.m,, Lillian Klosterman was on the front porch of her home at 844 Belmont Park North in Dayton, when a man in black clothing suddenly ran up onto her porch. When Klosterman moved toward her front door, so did the man. The man began asking Klosterman questions about whether she lived alone and how many people were inside the house. When Klosterman placed her hand on the handle of her front door, the man placed her in a choke hold and forcibly restrained her. Klosterman was able to pull the front door open and call her husband's name. When Klosterman's dog came out the front door, the man ran off. Klosterman went inside, locked the doors and called police.

{¶ 4} On October 1, 2009, at 7:50 p.m., Mary Beth Bozarth and Peggy Haywood, both nurses in the intensive care unit at Miami

Valley Hospital in Dayton, left work and walked to their cars in the parking lot on the corner of Apple Street and South Main Street. As the two women neared the entrance to the parking lot, Bozarth noticed a tall, thin African-American male wearing dark clothes, a black hooded sweatshirt with the hood pulled up, and green latex hospital gloves. The man followed the two women into the parking lot and then pulled out a knife and stabbed Bozarth in the neck. When Bozarth fell to the ground, the man stood over her demanding her purse, which he took off of Bozarth's arm. Meanwhile, Haywood fled the parking lot and ran out into the street, screaming for help. Haywood stopped a woman in a passing car who called police. When Haywood saw that the man was looking at her, she yelled at him that the police were on their way. The man then ran off down Apple Street.

{¶ 5} After the man left, Haywood assisted Bozarth in getting back inside the hospital. Bozarth remained in the hospital for two days for treatment of a six inch deep stab wound to her neck. Bozarth experienced neck pain, headaches and numbness in her arm, and she took medication and received physical therapy for two months. Bozarth is in need of plastic surgery for her injuries.

{¶ 6} Dayton police officers Theodore Trupp and Thomas Cope searched an area called Tent City, in Veterans' Park, at South Patterson Boulevard and West Stewart Street, not far from the

hospital where many homeless people lived, but found no one matching the assailant's description. One half hour later, Officers Trupp and Cope observed a man who matched the description of Bozarth's assailant near the hospital on Fairground Avenue. The man, later identified as Defendant Cundiff, fled when the officers approached, but was apprehended behind 124 Fairground Avenue. When stopped by Officer Trupp, Defendant took off a pair of green latex gloves and threw them down. While being placed in a police cruiser, Defendant stated: "Man, I didn't rob anybody. I did not stab anybody." Officer Trupp had not mentioned a robbery or a stabbing.

{¶ 7} Officer Cope and Defendant recognized each other. Later, when Defendant spoke with Officer Cope, he told him: "I didn't stab nobody, I didn't hurt nobody. I didn't rob nobody." Officer Cope had not mentioned a stabbing or a robbery. The officers transported Defendant to Miami Valley Hospital where Peggy Haywood viewed him via a two way mirror. She identified Defendant's general build and clothing as the same as the man who had stabbed and robbed Bozarth.

{¶ 8} The day after the attack on Bozarth, Detective Gaier found Bozarth's purse and the knife used in the attack in the woods between the county fairgrounds and South Patterson Boulevard. That same day, Detectives Beane and Elzholz interviewed Defendant, who admitted being at the parking lot where Bozarth was attacked

and that he wore green latex gloves while there. He disputed his identification as Bozarth's assailant. Defendant indicated no one would have been able to identify him because he would have put his hood up and pulled it tight around his face.

{¶ 9} A week after the attack on Bozarth, Lillian Klosterman spoke to her sister by phone. Klosterman's sister told her police had arrested someone, and it was in the news and on the internet. When Klosterman looked at the story on the internet there was a picture of Defendant. She immediately recognized Defendant as her attacker. Klosterman called police to report that she had seen the man who attacked her.

{¶ 10} On October 8, 2009, Detective Beane showed Shannon George a photospread. She immediately identified Defendant as the man who had robbed her and slashed her with a knife. On October 15, 2009, Detective Beane met with Lillian Klosterman and showed her a photospread. She identified Defendant as the man who ran up on her porch and put her in a choke hold.

{¶ 11} Defendant was initially indicted on two counts of aggravated robbery, two counts of felonious assault, and tampering with evidence with respect to his attack on Bozarth. One month later, a subsequent indictment was issued which added repeat violent offender specifications to the robbery and felonious assault counts involving Bozarth. The second indictment also

included two counts of aggravated robbery and two counts of felonious assault for the attack on Shannon George, all with repeat violent offender specifications, and abduction, aggravated menacing, and aggravated trespass charges for the attack on Lillian Klosterman.

{¶ 12} Defendant filed a motion to suppress his statements to police and the pretrial identifications of him, which the trial court overruled following a hearing. Defendant was found guilty following a jury trial of all aggravated robbery and felonious assault charges involving Bozarth and George, but not guilty of tampering with evidence. The repeat violent offender specifications and the charges involving Klosterman were tried separately to the court. The trial court found Defendant guilty of all of those specifications and charges. The court sentenced Defendant to prison terms totaling thirty-eight years.

{¶ 13} Defendant timely appealed to this court.

FIRST ASSIGNMENT OF ERROR

{¶ 14} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY FAILING TO GRANT A MISTRIAL WHEN THE STATE FAILED TO PROVIDE DEFENSE WITH INFORMATION 'MATERIAL TO THE PREPARATION OF A DEFENSE' PER MONTGOMERY COUNTY LOCAL RULE OF PROCEDURE 16(A)."

{¶ 15} Mary Beth Bozarth was shown a police photospread containing Defendant's photograph while she was hospitalized.

Bozarth was unable to identify her assailant from the photospread. A copy of a police report containing that information was provided to Defendant in discovery pursuant to Mont.Loc.R. 3.03(D)(2)(d).

{¶ 16} Bozarth testified at trial and identified Defendant in open court as her assailant. In cross-examination, Bozarth stated that she may have seen a photo of Defendant prior to trial, perhaps on television or in a newspaper, and that she had told police or prosecutors that she could identify Defendant as her assailant. Defendant moved for a mistrial for the State's failure to reveal that information in discovery.

{¶ 17} Detective Beane testified that she had shown Bozarth a photospread only once, while Bozarth was hospitalized, and that she could not identify Defendant from the photos she was shown. Defendant then conditionally withdrew his motion for a mistrial, if Bozarth "didn't testify to that, that she had looked at a photograph, then I withdraw my motion for mistrial. Does that make any sense?" (T. 569).

{¶ 18} The trial court found that the State, in preparation for trial, learned that Bozarth believed she could identify Defendant, which she did in open court, and that Bozarth "did not see the defendant until here in the courtroom or any pictures of the defendant . . . under these circumstances there is nothing that I have seen either in rule 16 or in the Montgomery County

local court management plan that requires disclosure of information of what a witness would say, unless it is a witness statement or a written witness statement or police report." (T. 570). The court denied Defendant's motion for a mistrial.

{¶ 19} The grant or denial of an order of mistrial lies within the sound discretion of the trial court. *State v. Glover* (1988), 35 Ohio St.3d 18. Moreover, mistrials need be declared only when the ends of justice so require and a fair trial is not longer possible. *State v. Franklin* (1991), 62 Ohio St.3d 118.

{¶ 20} Defendant argues that he had assumed that Bozarth would not identify him, based on the police report the State had provided him, and was surprised at trial when she identified him. Defendant's contention, in relation to the motion for mistrial he made, assumes a violation by the State of its duty to provide discovery.

{¶ 21} The trial took place on May 27 and 28, 2010, prior to the amendments to Crim.R. 16 that became effective on July 1, 2010. Neither before nor after those amendments would either party have a duty to reveal what its witness's trial testimony will be. Mont. Loc.R. 3.03(D)(2)(d)(i) requires the State to provide the accused at arraignment an information packet containing copies of "[a]ll police reports . . ." The State apparently did that. Unless Ms. Bozarth made a separate "witness statement" that division (ii)

of that local rule also requires the State to provide, no discovery violation is demonstrated.  There is no claim that Bozarth made any such additional statement that had been reduced to writing.  A witness's oral statements not reduced in some way to written form are not within the coverage of the local rule.

{¶ 22} Lacking any demonstrated discovery violation, the trial court did not abuse its discretion when it denied Defendant's motion for a mistrial.  The first assignment of error is overruled.

SECOND ASSIGNMENT OF ERROR

{¶ 23} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ENTERING FINDINGS OF GUILTY TO THE SUNDRY CHARGES OF FELONIOUS ASSAULT AND AGGRAVATED ROBBERY WHEREIN MARY BETH BOZARTH WAS FOUND TO BE THE VICTIM."

{¶ 24} Defendant argues that with respect to his aggravated robbery and felonious assault convictions where Bozarth was the victim, those convictions are against the manifest weight of the evidence because neither Bozarth nor the only other eyewitness to the crime, Haywood, could identify Defendant, and there was no blood on Defendant's clothes or the knife used in the attack.

{¶ 25} A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive.  *State v. Hufnagle* (Sept. 6, 1996), Montgomery App.

No. 15563. The proper test to apply to that inquiry is the one set forth in *State v. Martin* (1983), 20 Ohio App.3d 172, 175:

{¶ 26} "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Accord: *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52.

{¶ 27} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass* (1967), 10 Ohio St.2d 230. In *State v. Lawson* (August 22, 1997), Montgomery App. No. 16288, we observed:

{¶ 28} "Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the fact finder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the fact finder, who has seen and heard the witness."

{¶ 29} This court will not substitute its judgment for that

of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict. *State v. Bradley* (Oct. 24, 1997), Champaign App. No. 97-CA-03.

{¶ 30} The evidence presented by the State demonstrates that after Defendant stabbed Bozarth and she fell to the ground, he stood over her, looking at her. Bozarth testified that she carefully studied Defendant because, if she lived, she wanted to be able to describe him to police. She later did, accurately describing Defendant as a dark-skinned black male, six feet tall, thin, wearing a black hooded sweatshirt with the hood pulled up, and green hospital gloves. Bozarth positively identified Defendant at trial as her assailant. Furthermore, her identification was not based upon seeing Defendant sitting at counsel table. She testified: "I'm identifying him because I know exactly what he looked like . . . He stood over me and stared. And I looked at his clothes. I looked at everything about him."

{¶ 31} Moreover, the record demonstrates why Bozarth was unable to identify Defendant from the photospread while she was in the hospital. Bozarth was taking Fentanyl, a powerful narcotic to control pain which made her sleepy and affected her memory while she was on that medication. Bozarth's memory of what occurred at the time Defendant stabbed and robbed her was unaffected,

however.

{¶ 32} Peggy Haywood, the woman who was with Bozarth at the time Defendant attacked her, could not identify Defendant because she did not have the same opportunity to observe him that Bozarth had.  Haywood never saw Defendant's face.  When Haywood realized that Defendant was behind her and Bozarth, she ran.  Haywood only observed Defendant from a distance, but she accurately described his physical build and clothing, consistent with Bozarth's description.

{¶ 33} Although Bozarth's blood was not found on Defendant's clothes or the knife he used to stab Bozarth, Mark Squibb of the Miami Valley Regional Crime Lab testified that blood is not always transferred from the victim to the attacker, especially if the victim wore a lot of clothing that covered the wound.  Bozarth was wearing three layers of clothing, including a turtleneck that was soaked in blood.  Blood may not have remained on the knife because Defendant abandoned it outdoors and it rained heavily that night.

{¶ 34} Defendant's weight of the evidence argument ignores the fact that his convictions do not rest solely upon Bozarth's identification of him.  Surveillance cameras captured someone wearing the same dark clothing and green latex gloves as Defendant following Bozarth and Haywood into the parking lot moments before

Bozarth was stabbed and robbed. Police apprehended Defendant in an area near Miami Valley Hospital one hour after the stabbing wearing the same clothing and green gloves described by Haywood. Defendant fled upon seeing the officers and jumped a six foot privacy fence in an effort to escape. Defendant also made statements to the officers implicating himself in the attack.

{¶ 35} The credibility of the witnesses and the weight to be given to their testimony were matters for the trier of facts, the jury, to decide. *DeHass*. The jury did not lose its way simply because it chose to believe the State's witnesses, which it had a right to do. *Id*.

{¶ 36} Reviewing this record as a whole, we cannot say that the evidence weighs heavily against a conviction, that the trier of facts lost its way in choosing to believe the State's witnesses, or that a manifest miscarriage of justice has occurred. Defendant's convictions are not against the manifest weight of the evidence.

{¶ 37} Defendant's second assignment of error is overruled.

**THIRD ASSIGNMENT OF ERROR**

{¶ 38} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY FINDING APPELLANT GUILTY OF ANY AND ALL OFFENSES AGAINST VICTIM, LILLIAN KLOSTERMAN."

{¶ 39} Defendant argues that his convictions for abduction,

aggravated menacing and aggravated trespass, where Lillian Klosterman was the victim, are against the manifest weight of the evidence. Defendant contends that Klosterman's pretrial identification of him was unreliable because she saw Defendant's photograph in a news story on the internet before viewing the photospread, and she later told Defendant Beane she was having her doubts about her identification and wasn't sure it was really him.

{¶ 40} The evidence presented by the State demonstrates that Klosterman had ample opportunity to observe Defendant as they talked on Klosterman's front porch. In talking to her sister about this incident, Klosterman described Defendant's dark skin, wide-set eyes, and round face. Klosterman immediately recognized and identified him from the photospread. Klosterman did see a photograph of Defendant in a news story on the internet before she viewed the photospread. That caused her to gasp and exclaim: "My God, that's him," when she saw the photograph. Klosterman explained at trial that her identification of Defendant from the photospread was based upon  recognizing him as the man who ran up on her porch, and not seeing the photograph of him on the internet.

{¶ 41} After Klosterman had identified Defendant from the photospread, she called Detective Beane and said she wasn't sure

she wanted to testify, that she was having doubts about her identification of Defendant and wasn't sure. Klosterman explained at trial however that what she said to Detective Beane about being unsure of her identification wasn't true, that she was simply having second thoughts about being involved, and she was trying to get out of it because she lost her confidence. It had nothing to do with the validity of her identification of Defendant.

{¶ 42} The credibility of the witnesses and the weight to be given to their testimony were matters for the trier of facts, the trial court in this case, to decide. *DeHass*. The trial court did not lose its way simply because it chose to believe Klosterman's testimony and identification, which it had a right to do. *Id*.

{¶ 43} Reviewing this record as a whole, we cannot say that the evidence weighs heavily against a conviction, that the trier of facts lost its way in choosing to believe the State's witnesses, or that a manifest miscarriage of justice has occurred. Defendant's convictions are not against the manifest weight of the evidence.

{¶ 44} Defendant's third assignment of error is overruled.

**FOURTH ASSIGNMENT OF ERROR**

{¶ 45} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY FAILING TO SUPPRESS DEFENDANT'S COMMENTS OBTAINED BY ILLEGAL POLICE QUESTIONING."

{¶ 46} Defendant argues that the trial court erred when it overruled his motion to suppress statements he made to the police at the time police seized him because the police interrogated him while he was in custody without first informing him of his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶ 47} In *State v. Retherford* (1994), 93 Ohio App.3d 586, 592, we noted:

{¶ 48} "In a motion to suppress, the trial court assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses. *State v. Clay* (1972), 34 Ohio St.2d 250. Accordingly, in our review, we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard."

{¶ 49} The facts found by the trial court relative to this issue are as follows:

{¶ 50} "On October 1, 2009, Officer Theodore Trupp was a police officer for the City of Dayton working with his partner Officer Thomas Cope. They were patrolling in a marked police cruiser in the vicinity of Miami Valley Hospital on a report of an Aggravated

Robbery where the suspect had been described as a tall black male wearing black clothing. The officers were proceeding through a parking lot approaching Fairgrounds Avenue. Trupp was driving. He observed the shadow of a subject smoking a cigarette standing to his left. Trupp turned left onto Fairgrounds Avenue to approach the subject and, when he did so, the subject ran and jumped over a privacy fence into the yard at 122 Fairgrounds Avenue. Trupp dropped off Cope and then Trupp proceeded to the next intersection, turned left and then turned left again in the alley which proceeds behind 122 Fairgrounds Avenue. He saw the subject jump over the back privacy fence into the alley. It was the Defendant. The Defendant fit the description of the robbery suspect.

{¶ 51} "Trupp ordered the Defendant to stop at gunpoint. The Defendant ripped off a pair green rubber gloves that he had been wearing. Trupp placed the Defendant in handcuffs for his safety and Trupp specifically informed the Defendant that he was not under arrest. The Defendant repeatedly asked Trupp 'What did I do?' Trupp asked the Defendant what was he doing in the alley and what was he doing jumping the fence. The Defendant responded 'I was taking a shortcut.' At sometime during the detention, Officer Cope arrived. The Defendant recognized Cope and said to him 'Cope you know me, I'm Warlock.' One of the officers asked the Defendant why he was wearing gloves and the Defendant stated that his hands

were cold. Cope specifically told the Defendant that he was not going to jail. Cope told him this a couple of times. The Defendant was not advised of his Miranda rights because the officers did not believe the Defendant was under arrest. Nevertheless, the officers acknowledged that the Defendant was not free to leave.

{¶ 52} "At the point that Officer Trupp asked the Defendant to be seated in the police cruiser, with the handcuffs still applied, the Defendant stated 'I didn't rob anybody, I didn't stab anybody.' These statements were not made in response to any questions from either officer. Trupp testified that he had not said anything about a robbery before these statements were made and that those statements were volunteered by the Defendant.

{¶ 53} "Eventually, the Defendant was taken to the Security Office at Miami Valley Hospital where a witness was to observe him through a two-way mirror. At some point it was learned that the robbery suspect had been wearing green surgical gloves. At the hospital, the officers were instructed to arrest the Defendant for the robbery that was being investigated."

{¶ 54} Defendant argues that at the time he told Officer Trupp, "I didn't rob anybody. I didn't stab anybody," he was in custody and being questioned by police, and therefore was entitled to *Miranda* warnings which police failed to give him. The trial court concluded that at that time Defendant was not being subjected to

custodial interrogation and therefore *Miranda* warnings were not required.  We agree.

{¶ 55} In *State v. Hatten*, 186 Oho App.3d 286, 2010-Ohio-499, at ¶49-50, we wrote:

{¶ 56} "Police are not required to give warnings pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, to every person they question, even if the person being questioned is a suspect. *State v. Biros* (1997), 78 Ohio St.3d 426, 440, 678 N.E.2d 891. Instead, Miranda warnings are required only for custodial interrogations. Id. 'The determination of whether a custodial interrogation has occurred requires an inquiry into "how a reasonable man in the suspect's position would have understood his situation." [*Berkemer v. McCarty* (1984), 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317.] " '[T]he ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with formal arrest.' " ' *Estepp,* 1997 WL 736501, *4, quoting *Biros,* 78 Ohio St.3d at 440, 678 N.E.2d 891, in turn quoting *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275.

{¶ 57} "In reaching this determination, neither the subjective intent of the officer, nor the subjective belief of the defendant is relevant. *Estepp,* 1997 WL 736501, *4, citing *State v. Hopfer* (1996), 112 Ohio App.3d 521, 546, 679 N.E.2d 321, discretionary

appeal not allowed, 77 Ohio St.3d 1488, 673 N.E.2d 146. Instead, we have considered factors such as the location of the interview and the defendant's reason for being there, whether the defendant was a suspect, whether the defendant was handcuffed or told he was under arrest or whether his freedom to leave was restricted in any other way, whether there were threats or intimidation, whether the police verbally dominated the interrogation or tricked or coerced the confession, and the presence of neutral parties. Estepp at *4."

{¶ 58} In *State v. Keggan*, Greene App. No. 2006CA9, 2006-Ohio-6663, at ¶30-31, we observed:

{¶ 59} "Not all seizures rise to the level of a formal arrest. Under *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity has occurred or is about to occur. *State v.. Martin,* Montgomery App. No. 20270, 2004-Ohio-2738, at ¶ 10, citing *Terry,* supra; *State v. Molette,* Montgomery App. No. 19694, 2003-Ohio-5965, at ¶ 10. This investigatory detention, or '*Terry* stop', is more intrusive than a consensual encounter, but less intrusive than a formal custodial arrest. An investigatory detention is limited in duration and purpose and can only last

as long as it takes a police officer to confirm or to dispel his suspicions. *Terry, supra.* An individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or is compelled to respond to questions. *United States v. Mendenhall* (1980), 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497; *Terry,* 392 U.S. at 16, 19. The test for determining if a seizure is an arrest rather than a *Terry*-type detention is if a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest. *Yarborough v. Alvarado* (2004), 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938; *State v. Castro* (Sept. 20, 1995), Montgomery App. No. 14398.

{¶ 60} "In a typical investigatory detention, such as a routine traffic stop, individuals are not 'in custody' for purposes of *Miranda. Berkemer v. McCarty* (1984), 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317; *State v. Martin,* Montgomery App. No. 19186, 2002-Ohio-2621; *State v. Healy* (Aug. 4, 2000), Montgomery App. No. 18232. However, if the individual is, during the course of the detention, 'subjected to treatment that renders him "in custody" for practical purposes, he will be entitled to the full

panoply of protections prescribed by Miranda.' *Berkemer*, 368 U .S. at 440; *State v. Salyer* (Apr. 10, 1998), Miami App. No. 97-CA-39."

{¶ 61} In *Keggan*, we concluded that the defendant's detention was not custodial and that he was merely subject to investigatory detention, and therefore *Miranda* warnings were not required, where police stopped his vehicle, ordered him out, patted him down for weapons, told him he was not under arrest but was being placed in a police cruiser for safety reasons while they investigated, and was subsequently handcuffed while he accompanied police inside a home to look for a weapon. Although Keggan had been seized and clearly was not free to leave during the investigatory detention, his freedom of action was not restrained to a degree associated with a formal arrest. *Id.*, at ¶33-41.

{¶ 62} Here, Officers Trupp and Cope were investigating a stabbing and robbery of a woman at Miami Valley Hospital when they saw Defendant, who matched the suspect's general description in the area near where the attack had just occurred. As the officers approached, Defendant fled but was quickly apprehended. Police had sufficient, reasonable suspicion to initiate an investigatory stop of Defendant to determine whether he was the person who committed the stabbing and robbery. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Upon apprehending

Defendant, the officers patted him down for weapons. That action was reasonable and lawful as the officers had reasonable grounds to believe Defendant might be armed and dangerous, based upon the fact that the suspect in the stabbing and robbery was armed with a knife. *Id; State v. Jordan*, Clark App. No. 05CA4, 2006-Ohio-1813. Although Defendant was handcuffed and placed in a police cruiser while police investigated, he was explicitly told by the officers that this was being done for safety reasons, that he was not under arrest, and he was not going to jail. Defendant was not arrested until when police transported him to Miami Valley Hospital and Peggy Haywood had identified his physical build and clothing as being the same as the man who stabbed and robbed Bozarth.

{¶ 63} Although Defendant was clearly not free to leave and was subject to investigatory detention, those facts and circumstances do not demonstrate that Defendant's freedom of action was restrained to a degree associated with a formal arrest when police first seized him. We agree with the trial court that Defendant was not in custody for Miranda purposes at that time, and was not entitled to Miranda warnings.

{¶ 64} In any event, this record demonstrates that Defendant's statements to Officers Trupp and Cope that he didn't stab anybody and didn't rob anybody were not made in response to any questioning or interrogation by the officers, but rather were "volunteered"

statements that are admissible. *State v. Johnson*, Montgomery App. No. 20624, 2005-Ohio-1367, at ¶25.

{¶ 65} Defendant's fourth assignment of error is overruled. The judgment of the trial court will be Affirmed.

DONOVAN, J. And FROELICH, J., concur.

Copies mailed to:

Kirsten A. Brandt, Esq.
J. Allen Wilmes, Esq.
Hon. Dennis J. Adkins