[Cite as *State v. Zan*, 2013-Ohio-1064.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                               :

    Plaintiff-Appellee                     :             C.A. CASE NO.     24600

v.                                          :             T.C. NO.     09CR3496/3

PANDORA ZAN                                 :             (Criminal appeal from
                                                          Common Pleas Court)

    Defendant-Appellant                    :

                                            :

       . . . . . . . . . .

**O P I N I O N**

Rendered on the    22nd    day of     March    , 2013.

       . . . . . . . . . .

R. LYNN NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P. O. Box 341021, Beavercreek, Ohio 45434
      Attorney for Defendant-Appellant

       . . . . . . . . . .

FROELICH, J.

    **{¶ 1}** Pandora J. Zan was convicted by a jury of (1) complicity to commit

aggravated murder (prior calculation and design), (2) complicity to commit aggravated murder (while committing aggravated robbery – deadly weapon), (3) complicity to commit aggravated murder (while committing aggravated robbery – serious physical harm), (4) complicity to commit aggravated robbery (deadly weapon), (5) complicity to commit aggravated robbery (serious physical harm), (6) obstructing justice, (7) tampering with evidence (fingerprints), and (8) tampering with evidence (laptop). The charges arose from the role Zan played in the murder of her husband, Charles Zan, by her son, Cody Henderson, and her attempts to cover up their involvement in the crimes.

**{¶ 2}** At sentencing, the three complicity to commit aggravated murder counts were merged into Count 1, and the two complicity to commit aggravated robbery counts were merged into Count 5. Zan received an aggregated sentence of life in prison without the possibility of parole, plus 25 years.

**{¶ 3}** Zan appeals from her conviction, claiming that the trial court erred in denying her motion to suppress evidence and in allowing witnesses to testify about statements made by her co-conspirator, Henderson. She further claims that her sentence was an abuse of discretion. For the following reasons, the trial court's judgment will be affirmed.

I.

**{¶ 4}** At approximately 6:00 a.m. on October 17, 2009, Charles Zan, Pandora Zan's husband, was stabbed to death in the couple's apartment on Springboro Pike in Miamisburg. A few items, including two laptops and Charles Zan's firearm, were taken by the perpetrator. Shortly thereafter, at 6:13 a.m., Zan contacted the police.

{¶ 5} On the day of the murder and the days that followed, Zan made numerous statements to the police, both at her residence and at the police station. Zan initially claimed that she and her husband had been assaulted by intruders and that she was unconscious while her husband was killed. On October 19, Zan's daughter, Misty Henderson, told the police that Cody Henderson (her brother) had killed Charles Zan, their stepfather, and that her mother (Zan) wanted to tell the police what had happened. Zan also implicated her son. That day, Zan assisted the police in apprehending Henderson. At this juncture, Zan was not charged or arrested for any crimes in connection with her husband's death.

{¶ 6} In April 2010, Zan told her probation officer (in an unrelated case) that she wanted to speak to prosecutors because she was concerned that Henderson was making statements to the police that implicated her in her husband's death. Detectives came to Zan's home and spoke with her for more than two hours. Zan initially denied any involvement in the murder, but ultimately confessed to planning the murder with Henderson. At the conclusion of the interview, Zan was taken into custody and transported to the police department, where she made additional incriminating statements. Zan was subsequently indicted on numerous counts of complicity to commit aggravated murder, complicity to commit aggravated robbery, tampering with evidence, and obstructing justice, all stemming from her involvement in her husband's murder.

{¶ 7} In June 2010, Zan filed a motion to suppress all statements that she made to the police. Zan claimed that her statements were made in violation of her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A hearing on the motion was held on August 5, 2010. In a supplemental memorandum filed (with the court's

permission) following the hearing, Zan asserted that the statements she made on October 19, 2009, must be suppressed because she had invoked her right to counsel. She further claimed that her statements of April 27, 2010, were involuntary and were made as a result of an interrogation technique recognized as unlawful in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2401, 159 L.Ed.2d 643 (2004). The trial court overruled the motion in its entirety.

{¶ 8} Shortly before trial, the State filed a motion asking the court to allow the admission of co-conspirator statements at trial, pursuant to Evid.R. 801(D)(2)(e). The motion concerned statements by Cody Henderson to Nicholas Howard and Brittannie Michelle Taylor. The court permitted the statements to be used at trial.

{¶ 9} Zan was tried in March 2011. She was convicted of all charges, and the court sentenced her to a mandatory term of life in prison without the possibility of parole for conspiracy to commit aggravated murder, a mandatory term of ten years in prison for complicity to commit aggravated robbery, and 5 years each for the remaining charges; all the sentences were to be served consecutively.

{¶ 10} Zan raises three assignments of error on appeal.

## II.

{¶ 11} Zan's first assignment of error states:

THE TRIAL COURT ERRED WHEN IT OVERRULED DEFENDANT'S

MOTION TO SUPPRESS.

{¶ 12} In her first assignment of error, Zan claims that the trial court erred in denying her motion to suppress the statements she made on April 27, 2010. First, she argues that she should have been given *Miranda* warnings at the start of the interview at her

apartment. Second, she asserts that the subsequent formal interview at the police station was the result of an improper "question first, *Mirandize* later" police tactic.

{¶ 13} When ruling on a motion to suppress, "the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Hopfer*, 112 Ohio App.3d 521, 679 N.E.2d 321 (2d Dist.1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994). In reviewing a trial court's decision on the motion to suppress, an appellate court must accept the trial court's findings of fact as true, if they are supported by competent, credible evidence. *State v. Dudley*, 2d Dist. Montgomery No. 24904, 2012-Ohio-960, ¶ 6. The appellate court must then determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. *Id.*

{¶ 14} The trial court made extensive findings in its ruling denying Zan's motion to suppress. With respect to the interactions between the police and Zan on April 27, the court found the following facts:

> Law enforcement had no further contact with Defendant until April 27, 2010. Defendant had told her probation officer [in an unrelated case] that she wanted to speak with the police because she was concerned that Cody Henderson had begun making statements to police that implicated Defendant. Sgt. Muncy and Det. Tom Thompson went to Defendant's apartment on King Avenue in Dayton, Ohio on April 27th. Muncy and Thompson were dressed in plain clothes. Defendant voluntarily let them into her apartment. Defendant was told that she was free to not speak with them.

Defendant stated that she was willing to speak. Defendant moved around her apartment. She got up to smoke near the front door. Defendant never asked the officers to leave. Defendant never requested an attorney. No threats or promises were made to Defendant during this interview. An audio recording was made of this interview and admitted as State's Ex. 6.

Based on statements made by Defendant at her apartment on April 27th, Sgt. Thompson left Defendant's apartment to contact the prosecutor's office. Based upon that contact with the prosecutor's office, Defendant was taken into custody. Defendant was not handcuffed, but Defendant was transported to the police station and Defendant was not free to leave. On the way to the police station, they stopped at a fast food restaurant to get Defendant food, which she ate.

Defendant was transported to the Miamisburg police stations' interview room. Defendant was advised of her Miranda rights using a written pre-interview Miranda form. Defendant stated that she understood her rights and the waiver of them. Defendant had been arrested on two prior occasions (an armed robbery [in 2002] and also earlier in 2010 [for petty theft and forgery]), where she had received Miranda warnings (State Ex. 12, 13). Defendant voluntarily signed the waiver of rights form (State Ex. 8). No threats or promises were made to Defendant on April 27th. The entirety of the in-custody April 27th interview was video recorded. There are no indications whatsoever of any drug or alcohol impairment of Defendant

during this interview, or during any of the other interviews of Defendant.

During the custodial interview, Defendant took a substantial amount of time to write out a six page statement (State Ex. 10) and an "apology letter" to the family of the victim (State Ex. 11). As is the case with all of the recorded interviews of Defendant, Defendant was at all times treated courteously and in a non-threatening manner by the police. The record is totally devoid of any evidence of duress, coercion or threats visited upon Defendant in any way.

Following the April 27th interview at the police station, Defendant requested the opportunity to talk face-to-face with her family. The Detectives granted this request. Misty Henderson and other family members came to the police station and met with Defendant in the records section of the police department. A ten minute conversation occurred, with police present. Defendant was then transported to the Montgomery County Jail.

{¶ 15} The trial court indicated that it had considered the testimony of Sgt. Muncy at the suppression hearing and reviewed the video/audio recordings admitted into evidence, as well as the written exhibits. We have also reviewed the transcript of the suppression hearing, as well as audio and video recordings and documentary evidence from April 27, 2010.

{¶ 16} In *Miranda*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the United States Supreme Court held that the State may not use statements stemming from a defendant's custodial interrogation unless it demonstrates the use of procedural safeguards to secure the

defendant's privilege against self-incrimination. *Id*. at 444. Police are not required to give *Miranda* warnings to every person that they question, even if the person being questioned is a suspect. *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997). Instead, *Miranda* warnings are only required for custodial interrogations. *Id.* "Custodial interrogation" means questioning initiated by the police after the person has been taken into custody or otherwise deprived of his freedom in any significant way. *State v. Wilson*, 2d Dist. Montgomery No. 22665, 2009-Ohio-1279, ¶ 18, citing *State v. Steers*, 2d Dist. Greene No. 89-CA-38, 1991 WL 82974 (May 14, 1991). In order for a defendant's statements made during a custodial interrogation to be admissible, the State must establish that the accused knowingly, voluntarily, and intelligently waived his or her rights. *Miranda*, *supra*; *State v. Edwards*, 49 Ohio St.2d 31, 38, 358 N.E.2d 1051 (1976), overruled on other grounds, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

{¶ 17} Neither the subjective intent of the officer nor the subjective belief of the defendant is relevant in determining whether the defendant was in custody. *State v. Cundiff*, 2d Dist. Montgomery No. 24171, 2011-Ohio-3414, ¶ 57. "Instead, we have considered factors such as the location of the interview and the defendant's reason for being there, whether the defendant was a suspect, whether the defendant was handcuffed or told he was under arrest or whether his freedom to leave was restricted in any other way, whether there were threats or intimidation, whether the police verbally dominated the interrogation or tricked or coerced the confession, and the presence of neutral parties." *Id.*, quoting *State v. Hatten*, 186 Ohio App.3d 286, 2010 -Ohio- 499, 927 N.E.2d 632, ¶ 50 (2d Dist.).

{¶ 18} Even when an individual is not in custody and *Miranda* warnings are not

required, a defendant's statement may be involuntary and subject to exclusion. *State v. Porter*, 178 Ohio App.3d 304, 2008-Ohio-4627, 897 N.E.2d 1149, ¶ 14 (2d Dist.), citing *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *Edwards*, 49 Ohio St.3d at paragraph two of the syllabus. *See also State v. Brewer*, 48 Ohio St.3d 50, 58, 549 N.E.2d 491 (1990); *State v. Marks*, 2d Dist. Montgomery No. 19629, 2003-Ohio-4205. A defendant's statement to police is voluntary absent evidence that his will was overborne and his capacity for self-determination was critically impaired due to coercive police conduct. *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); *State v. Otte*, 74 Ohio St.3d 555, 562, 660 N.E.2d 711 (1996).

{¶ 19} In asserting that the interview at her apartment was a custodial interrogation, Zan emphasizes that she repeatedly asked permission to move around her apartment during the interview, and she focuses on the following exchange that occurred shortly after the detectives entered her apartment:

Sgt. Muncy: Okay, Pandora. We want – we want to give you one more opportunity to talk to us. And I think you know what's going on and what's about to happen.

Zan: Can I close the door?

Det. Sgt. Thompson: Absolutely, Pandora.

Sgt. Muncy: Sure.

Det. Sgt. Thompson: You're not under arrest or anything right now, so you can do whatever you want, okay?

Sgt. Muncy: I think you know what's going on and what's about to happen. And we just –. Listen, listen, listen to me. Before you say anything, I want you to know that I know Chuck's been, Chuck was mean to you guys. * * * He was a jerk, okay? But we've been talking to Cody. And I think you know that, and you know what's about to happen. And –.

Zan: He's lying.

Sgt. Muncy: But. Pandora.

Zan: He is lying.

Sgt. Muncy: I know –

Zan: He told me Sunday when I went and visited him about the deal. And that he was gonna burn me. That's what he told me.

Sgt. Muncy: All the other facts. Listen, all the other facts – and we'll tell you about some things we know. We know a lot more than just what Cody's telling us. We've got a lot more facts to back this up. And that's why we want to give you the opportunity to at least give us a reason. I don't want people to think you did this just because you're cold-hearted, that you set this up because you're cold-hearted. There's a reason you did. * * *

{¶ 20}  Upon review of the entire record, we agree with the trial court that Zan was not in custody when the officers interviewed her at her residence. The record reflects that,

although the detectives' visit was not scheduled, Zan invited them into her apartment and she agreed to talk to the detectives. The officers were in plain clothes, they spoke with Zan in the living room of her apartment, and they made clear at the beginning of the interview that Zan was not under arrest and was free to move around. At all times, the detectives spoke courteously and in a non-threatening manner with Zan; the officers did not threaten Zan and there is no evidence that they engaged in any coercive behavior.

{¶ 21} It is clear that Cody Henderson's decision to cooperate with the State played a significant role in the detectives' decision to talk with Zan and in Zan's decision to talk with the detectives. Sgt. Muncy testified at the suppression hearing that Zan told her probation officer that she wanted to talk with the prosecutor's office, because she had come to realize that Henderson was talking to the prosecutors about making a deal to turn in Zan for her involvement in Charles Zan's homicide. Sgt. Muncy testified, "And we just thought that would be a good time to go out and talk to her." The officers' references to Henderson's cooperation and efforts to make a deal with the prosecutors – "I think you know what's going on and what's about to happen" – may have led Zan to decide to talk with the officers, but it did not turn the encounter into a custodial interrogation. Although the officers spoke with Zan at her apartment for over two hours, we find nothing in the audio recording or in Sgt. Muncy's testimony at the suppression hearing to support Zan's contention that she was in custody and entitled to *Miranda* warnings prior to the detectives' decision, at the conclusion of the interview, to contact the prosecutor's office and then place her under arrest.

{¶ 22} We also find no merit to Zan's claim that her statements during the

subsequent formal interview at the police station were the result of an improper "question first, *Mirandize* later" police tactic. Zan claims that the officers used an interrogation technique that was recognized as unlawful in *Seibert*, 542 U.S. 600, 124 S.Ct. 2401, 159 L.Ed.2d 643.

{¶ 23} *Seibert* concerned the situation where the interrogating police officer obtained a confession in violation of an accused's *Miranda* rights. After a short break, the officer provided *Miranda* warnings and then led the suspect to repeat her prior incriminating statements. A plurality of the United States Supreme Court held that, "[b]ecause this midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda's* constitutional requirement, * * * a statement repeated after a warning in such circumstances is inadmissible." *Seibert* at 604. The Supreme Court held that both the pre-*Miranda* and post-*Miranda* statements were inadmissible.

{¶ 24} *Seibert* is often contrasted with *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), an earlier case in which the Supreme Court held admissible a post-*Miranda* confession that followed a pre-warning admission solicited by an officer while the suspect was in custody. "In *Elstad,* police went to the home of an eighteen-year old defendant with a warrant for his arrest. While one officer went to the kitchen to explain to the suspect's mother that her son was being arrested in connection with a burglary that occurred at the home of a neighbor, another officer stayed with Elstad in the living room and had a brief discussion with him. The officer explained the neighbor's house had been robbed and that he thought Elstad was involved. Elstad stated to the officer 'Yes, I was there.' Police took Elstad to the police station, and about one hour later, interviewed him in

the office of one of the officers. The police administered *Miranda* to Elstad for the first time without mentioning his previous admission. Elstad subsequently waived his rights and made a full, detailed confession regarding his involvement in the burglary." *State v. Cook*, 2d Dist. Montgomery No. 24524, 2012-Ohio-111, ¶ 21-22 (summarizing *Elstad*).

**{¶ 25}** The United States Supreme Court allowed Elstad's confession given after *Miranda* warnings to be admitted at trial. The Court noted that "a finding of voluntariness for the purposes of the Fifth Amendment is a threshold requirement in determining whether the confession may be admitted in evidence." The *Elstad* Court emphasized that "there was no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary." *Id.* at 318. Instead, "the relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Id.* This is determined by examining the surrounding circumstances and the entire course of police conduct. *Id.* Accordingly, the *Elstad* Court held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.*; *see also Cook* at ¶ 23.

**{¶ 26}** The *Seibert* Court contrasted the facts in *Seibert* from those in *Elstad*, noting "a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object:" (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and the second interrogations, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions

treated the second round as continuous with the first. *Seibert* at 615. "*Elstad* and *Seibert* stand on opposite sides of the line defining where pre-warning statements irretrievably affect post-warning statements. Still, that line cannot be said to be bright or sharply defined." *State v. Farris*, 109 Ohio St.3d at 523, 2006-Ohio-3255, 849 N.E.2d 985.

{¶ 27} Here, Zan focuses on the fact that the officers spoke with her in her apartment for more than two hours and that she made statements revealing her complicity in the plan to kill her husband and her involvement in covering up the crime. Zan was subsequently transported to the police station, where she was questioned again by the same two detectives. She gave incriminating statements consistent with those she made at her apartment.

{¶ 28} We nevertheless find *Seibert* to be distinguishable, because Zan was not in custody when she spoke with the detectives at her apartment, at least up to the point where the officers informed her (at the end of their conversation) that they needed to contact the prosecutor. As stated above, the detectives came to Zan's residence based on reports that Zan wanted to speak to the prosecutor, as she had heard that Henderson was now speaking to the State about Zan's involvement in the crime. Zan welcomed the detectives into her apartment, and the detectives expressly told Zan that she was not under arrest. The entire conversation was respectful and non-coercive, and there is no indication that any of Zan's statements were involuntarily given. Zan did not make a custodial statement to the detectives and then, after *Miranda* warnings, give another statement repeating her prior confession. Her statements at the police station, while repetitive of her statements in the apartment, were her only custodial statements on April 27, 2010.

**{¶ 29}** The first assignment of error is overruled.

II.

**{¶ 30}** Zan's second assignment of error states:

THE TRIAL COURT ERRED WHEN IT ALLOWED HEARSAY

STATEMENTS INTO EVIDENCE.

**{¶ 31}** In her second assignment of error, Zan claims that the trial court erred in allowing into evidence statements made by her co-conspirator, Cody Henderson, to Brittannie Michelle Taylor and Nicholas Howard. Taylor is Henderson's former fiancé and the mother of his child; Howard is Henderson's best friend. Zan objected to the admissibility of Henderson's statements to Taylor and Howard, both before trial and at trial.

**{¶ 32}** Taylor testified that, on Friday, October 16, 2009, Zan picked up Henderson and Taylor and drove them to a car rental facility, where Zan rented a red car for Henderson to use. After Henderson and Taylor left in the rental car, Henderson told Taylor that he and Zan had a plan whereby he would go to his mother's house and kill his stepfather. Henderson stated that Zan would give him $25,000 from Charles Zan's life insurance policy in return. Henderson and Taylor discussed using that money to buy a house. Taylor testified that she did not report the conversation to anyone, because she did not believe that Henderson had meant it.

**{¶ 33}** Taylor further testified that she and Henderson spent that evening at a haunted house with Nick Howard and a girl she didn't know. In the early morning hours of October 17, Henderson drove to an apartment complex and parked. He left the car wearing plastic gloves. When Henderson returned, he had blood on his face and hands, a cut on his

face, and a bag with two laptop computers in it. Henderson told the group that he had killed his stepfather. Henderson had Howard drive the car to Henderson's father's home. Henderson took the bag into his father's house. In the days after the murder, Taylor saw Henderson and Howard burn Henderson's bloody clothes and attempt to sell one of the laptop computers.

{¶ 34} Howard testified that on October 16, 2009, Henderson picked him up in a red Chevy HHR, and the two went to a pool hall to play pool. Henderson told Howard that he had plans to rob someone of two laptops. Later that evening, Henderson and Howard picked up Taylor from her home and went to a haunted house. While there, Howard met a female friend from high school named Alyssa; when Alyssa was finished working at the haunted house, she left with Howard, Henderson and Taylor. The group played pool at a different establishment and then spent some time at Taylor's home.

{¶ 35} Early in the morning of October 17, the group left Taylor's house. Henderson stated in the car that he was "going to Dayton to hit the lick on the laptops," meaning that he was going to rob someone. Henderson drove to the Zans' apartment complex off of Springboro Pike and got out of the car. The other individuals waited in the car. After about 45 minutes, Henderson came running back with a bag in his hand and told Howard, "Shit went bad. Shit went bad. I need you to drive." Once back in the car, Henderson took off several items of clothing and put them in another bag. Henderson told Howard how to get to Henderson's father's house.

{¶ 36} As Howard drove, he asked Henderson what had happened. Howard testified that Henderson responded:

He told me that he originally had walked up to the apartment, started to cut the screen and that a dog * * * started barking * * * and [that] had arose Pandora and she had come to the door and Cody's words exactly, mysteriously walked the dog. She walked out and he walked in. * * * He stood at the edge of the bed, looked at Chuck and just thought about all the stuff that had happened over the years, between the abuse with his mother, his self, his sister and at that point he snapped, jumped on top of the man and slit his throat. Held his head to the pillow and slit his throat. * * * [Pandora] just went to walk the dog. * * * Basically [there was] a fight with Chuck at that point and that Chuck had somehow managed to get the knife away from him and was going for his gun. Told me that he had yelled at his mother to get him another knife and she did and once that, he basically just started stabbing until he [Chuck] didn't struggle anymore.

{¶ 37} Howard further testified that, upon reaching Henderson's father's house, Henderson took the bags with his clothes and the laptops from the car and took them to a barn. Henderson then drove Howard home.

{¶ 38} Henderson picked up Howard between 1:00 p.m. and 2:00 p.m. the same day. Zan was in the passenger seat of the car. Howard overheard Henderson tell Zan, "I can't believe you got me the other knife," and Zan reply, "I can't believe you actually did it." Zan asked Howard to sell the laptops and give the money to Henderson; Howard responded that he would. Zan also asked Howard to erase the hard drives and to "keep quiet" about what had happened.

{¶ 39} Howard later sold one of the laptops to a friend. Afterward, he and Henderson took a bag of items, including the other laptop, a pistol and a wallet, to another house owned by Henderson's father. The next day, Henderson, Howard, and Taylor took Henderson's bloody clothes to a "fishing hole" in Middletown, Ohio, and burned them. Howard further testified that Henderson told him that he (Henderson) had committed the crimes because Zan had offered to pay him $25,000 from Charles Zan's life insurance.

{¶ 40} On appeal, Zan claims that the statements made by Henderson to Taylor and Howard were inadmissible hearsay, because they did not fall within Evid.R. 801(D)(2)(e), which excludes certain statements of a co-conspirator from the definition of hearsay. "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). In general, hearsay is not admissible. Evid.R. 802.

{¶ 41} "Under Evid.R. 801(D)(2)(e), hearsay does not include a statement offered against a party that is made 'by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy.' 'The statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof.' Evid.R. 802(D)(2)(e) does not require that explicit findings of the conspiracy be made on the record." (Citations omitted.) *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 116.

{¶ 42} "A conspiracy does not necessarily end with the commission of the crime. A statement made by a co-conspirator after the crime may be admissible under Evid.R.

801(D)(2)(e) if it was made in an effort to conceal the crime." (Citations omitted.) *State v. Braun*, 8th Dist. Cuyahoga No. 91131, 2009-Ohio-4875, ¶ 109; *see also State v. Burns*, 5th Dist. Richmond No. 10CA130, 2011-Ohio-5926, ¶ 92. As we stated in *State v. Boone*, 2d Dist. Montgomery No. 7516, 1983 WL 4843 (Mar. 4, 1983):

> The acts and declarations of a conspirator are admissible against a coconspirator when they are made during the pendency of the wrongful act, and this includes not only the perpetration of the offense, but also its subsequent concealment. *The theory for the admission of such evidence is that persons who conspire to commit a crime, and who do commit a crime, are as much concerned, after the crime, with their freedom from apprehension, as they were concerned, before the crime, with commission; the conspiracy to commit the crime devolves after the commission thereof into a conspiracy to avoid arrest and implication.*

(Emphasis in original.) *Id.* at \*4, quoting *State v. De Righter*, 145 Ohio St. 552, 558, 62 N.E.2d 332 (1945).

**{¶ 43}** Zan claims that Henderson's statements were not made "during the course of and in furtherance of the conspiracy" between them.

**{¶ 44}** In general, a co-conspirator's statements to a third party which simply describe the events that occurred are not made in furtherance of the conspiracy. *See Braun* at ¶ 113 (statements of co-conspirator who bragged about the murder were not made in furtherance of the conspiracy); *State v. Smith*, 87 Ohio St.3d 421, 721 N.E.2d 93 (2000). *See also State v. Carter*, 72 Ohio St.3d 545, 651 N.E.2d 965 (1995), paragraph four of the

syllabus ("A confession to police by one co-conspirator implicating a second co-conspirator is not made 'during the course and in furtherance of the conspiracy' within the scope of Evid.R. 801(D)(2)(e), as such a statement is made at a point in time when the confessor is no longer attempting to conceal the crime and has abandoned the conspiracy."). Such statements to third parties can be contrasted with those made by a conspirator who was present when the crime was committed to other co-conspirators who were not. *E.g., Boone, supra.* We noted in *Boone* that the statements of a conspirator who committed the offenses to co-conspirators who had not personally observed the commission of the crimes were in furtherance of the conspiracy, because the statements made the other conspirators aware of the circumstances involved in the actual execution of the crimes, thereby informing those conspirators of the extent to which the actions of a conspirator had exceeded the original plan.

{¶ 45} In this case, Howard and Taylor were not conspirators in the plan to kill Charles Zan. Howard testified that he asked to be driven home instead of going to the location where Henderson planned to rob someone, but Henderson refused. Henderson told Howard that he (Howard) would be "part of his [Henderson's] alibi." After the murder, Henderson described the murder to Howard while Howard drove Henderson (with Taylor and Alyssa in the vehicle) to Henderson's father's home, where Henderson hid his bloody clothes and the laptops he had stolen.

{¶ 46} We find it to be a close question whether Henderson's statements to Taylor and Howard that he killed Charles Zan and Henderson's detailed description of his actions in committing the murder were made in furtherance of the conspiracy. While Henderson's

statements could be seen as merely describing his actions to his close associates, it could also be interpreted as informing these friends of his actions so they could help him avoid detection and apprehension by the police.

**{¶ 47}** Regardless, the admission of Henderson's confessions to killing Charles Zan and his description of his own actions while in the Zans' apartment were harmless, as there was never any dispute at Zan's trial that Henderson fatally stabbed his stepfather and stole the laptops. Defense counsel specifically stated during his opening statement that there was no dispute that "Cody did it. * * * Cody killed Charles."

**{¶ 48}** As part of Henderson's description of the murder to Howard, Henderson told Howard that he asked his mother to get him another knife during the stabbing and Zan complied. We do not find that this statement was made in furtherance of the conspiracy.

**{¶ 49}** However, Howard also heard Henderson and Zan talking with each other shortly after the murder, during which Henderson told Zan, "I can't believe you got me the other knife," and Zan replied, "I can't believe you actually did it." As part of this conversation, Zan asked Howard to "keep quiet" about what had happened and to sell the laptops and give the money to Henderson. This conversation between Zan, Howard, and Henderson occurred as part of plan to conceal the crime and sell the proceeds of the robbery. Thus, these statements were admissible under Evid.R. 801(D)(2)(e). The admission of Henderson's initial statement to Howard that Zan provided him a knife during the murder was harmless.

**{¶ 50}** Henderson's description of the murder also indicated that Zan went outside to walk her dog. We fail to see how this statement to Howard was made in furtherance of

the conspiracy. However, Zan acknowledged in her April 27, 2010 written statement that she went outside with her dog after Henderson arrived at her apartment, and Zan's neighbor, Ralph Van Gundy, testified at trial that he saw Zan standing outside with her dog at 6:00 a.m., within minutes of his hearing Charles Zan's cries for help. Carla Hairston testified that she and Zan were in the Montgomery County Jail together on July 3, 2010. While describing the murder to Hairston, Zan said that she stood outside with the dog, that a neighbor looked out the window, and she waved him off. Zan herself testified at trial that, when Henderson came into the apartment, she took the dog outside. Henderson's statement to Howard that Zan took her dog outside was harmless.

{¶ 51} Finally, Howard and Taylor both testified that Henderson told them Zan promised him (Henderson) $25,000 from Charles Zan's life insurance policy in return for Henderson's killing Charles Zan. Even if these statements were hearsay, they were also harmless. Zan admitted in her statements to the police that she had promised to give Henderson money, to buy him a car, and to take care of his children after Charles Zan was dead. Sgt. Muncy testified that Zan had told him that she and Henderson planned to get Charles Zan's insurance money. Hairston further testified that Zan told her that she (Zan) and her son had killed her "ex-husband" for insurance money totaling $400,000.

{¶ 52} Zan's second assignment of error is overruled.

III.

{¶ 53} Zan's third assignment of error states:

THE TRIAL COURT ABUSED HER DISCRETION IN SENTENCING DEFENDANT.

**{¶ 54}** In her third assignment of error, Zan claims that the trial court's aggregate sentence of life in prison without the possibility of parole, plus 25 years, was an abuse of discretion. She emphasizes that, while she did not stop Henderson from killing her husband, she was not the person who actually killed Charles Zan.

**{¶ 55}** We review a felony sentence using a two-step procedure. *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶ 4. "The first step is to 'examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law.'" *State v. Stevens*, 179 Ohio App.3d 97, 2008-Ohio-5775, 900 N.E.2d 1037, ¶ 4 (2d Dist.), quoting *Kalish* at ¶ 4. "If this step is satisfied, the second step requires that the trial court's decision be 'reviewed under an abuse-of-discretion standard.'" *Id.*

**{¶ 56}** The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences. *See State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, at paragraph seven of the syllabus . However, the trial court must comply with all applicable rules and statutes, including R.C. 2929.11 and R.C. 2929.12. *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 37.[1] Zan has not argued that her sentence was contrary to law.

**{¶ 57}** Upon review of the record, we disagree with Zan's contention that her sentence was an abuse of discretion. There was substantial evidence at trial that Zan

---

[1] Zan was sentenced on April 21, 2011, prior to the effective date of Am.Sub.H.B. 86, which amended Ohio's sentencing scheme. Accordingly, the trial court was not required to make statutory findings prior to imposing consecutive sentences.

planned the murder of Charles Zan with Henderson. Several witnesses testified that Zan and Henderson discussed killing Charles Zan for insurance money. Zan offered to give $25,000 to Henderson and to use the money to buy things for Henderson and his children. Zan and Henderson discussed several ways that Charles could be killed, and ultimately decided that Henderson would slit his throat. Zan rented a car for Henderson, in part so that he had a vehicle to get to and away from the Zans' apartment. Henderson showed Zan the knife he planned to use to kill Charles. Prior to the murder, Zan moved her husband's firearm from the bedside table so that he would not be able to shoot Henderson when Henderson came to murder him. Zan let Henderson into the apartment on the morning of October 17, 2009; Henderson then stabbed Charles Zan more than 40 times. Charles Zan was still alive when Zan returned to the apartment. Instead of seeking aid for him, she assisted Henderson when he asked for her help. Zan wiped up blood evidence and held a bag while Henderson put laptops and Charles's gun into it. After the murder, Zan called the police and lied about what had happened. She also asked Henderson's friend, Howard, to sell the laptops.

{¶ 58} Although it was Henderson, not Zan, who fatally stabbed Charles Zan, Zan was equally culpable in the murder and robbery, and she obstructed justice and tampered with evidence in her efforts to avoid her and Henderson's apprehension. As stated by the trial court, Zan "was the primary facilitator and the primary reason for the murder of Charles Zan." Zan had prior felony convictions, including offenses involving violence and firearms. The court found that Zan had not shown genuine remorse. We find no abuse of discretion in the trial court's decision to impose maximum consecutive sentences, totaling life in prison

without the possibility of parole, plus 25 years.

{¶ 59}   Zan's third assignment of error is overruled.

IV.

{¶ 60}   The trial court's judgment will be affirmed.

. . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies mailed to:

R. Lynn Nothstine
Robert Alan Brenner
Hon. Mary L. Wiseman