The STATE of Ohio, Appellee,

v.

PORTER, Appellant.

[Cite as *State v. Porter*, 178 Ohio App.3d 304, 2008-Ohio-4627.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 22369.

Decided Sept. 12, 2008.

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Terry R. Hart, Montgomery County Public Defender, for appellant.

GRADY, Judge.

{¶ 1} Defendant, Christine Porter, appeals from her conviction and sentence for possession of crack cocaine, which were entered on her plea of no contest after the trial court overruled Porter's motion to suppress her statements and physical evidence obtained by law-enforcement officers that were products of her interrogation while Porter was an inmate of the Montgomery County Jail.

{¶ 2} In overruling defendant's motion to suppress the evidence, the trial court found the following facts:

{¶ 3} "On December 4, 2006, a Montgomery County Sheriff Corrections Officer ('officers') received a report from two inmates that the Defendant, Christine

Porter ('Defendant'), was in possession of an 'eight ball.' As a result of these reports, two officers were sent to investigate the allegations. When the officers arrived, the Defendant was sent from the housing area into the vestibule. She was asked by one of the officers whether she was in possession of any contraband or other illegal substance. The Defendant indicated she was not. The officer then asked the Defendant to place her hands on the wall so they could pat her down. The Defendant placed her hand inside the crotch area of her pants. She would not keep her hands on the wall and was not cooperative. During a period when her hands were on the wall, the officer doing the pat down felt a foreign object in the Defendant's crotch area. However, the Defendant would not spread her legs enough for the officers to determine what the object was. Since the Defendant would not cooperate, the officers handcuffed her and called for their supervisor Sergeant Milburn ('Milburn').

{¶ 4} "The Defendant was moved from the vestibule to the female dressing area. Two additional female officers were summoned to that area and were present with Milburn, the Defendant, and the original two officers. The situation was explained to Milburn and he instructed the officers to perform another pat down. The four officers took the Defendant into the shower portion of the female dressing area. The handcuffs were removed and she was again asked to place her hands on the wall. Again, the Defendant would not cooperate and clinched her legs together preventing a search of the area where the officer felt the foreign object. At that time, the Defendant told officers she had a broken condom inside her. The officers relayed this information to Milburn and he offered to provide the Defendant medical care to have the condom removed. She refused the offer for medical care.

{¶ 5} "Milburn instructed the officers to again handcuff the Defendant and he left to complete a strip search form. After completing the form, Milburn instructed the four officers to perform a strip search of the Defendant. The Defendant was again taken into the shower area and a strip search was conducted. After removing her clothes, the Defendant was told to squat and cough. She followed those instructions, but there was no evidence recovered. The Defendant was then allowed to get dressed and brought back out of the shower portion of the dressing area. Milburn informed the Defendant that he believed she had contraband on her and she again denied it. Milburn explained to the Defendant that he was going to contact a detective to have a search warrant obtained for a body cavity search. He indicated to her that she could 'end it' by cooperating and giving the officers any contraband she might have. He also informed her that he would charge her with everything he could, if there were drugs discovered during the body cavity search. The Defendant again indicated she did not have anything.

{¶ 6} "Milburn then had the Defendant taken to the female waiting area, so that he could contact a detective about a search warrant. Prior to having an opportunity to contact the detective, Milburn was told the Defendant wanted to speak with him. He returned to speak with her and she admitted having drugs inside her vaginal area and agreed to remove them to one of the officers. The drugs were then given to Milburn. The Defendant was then taken back to the female waiting area. At no time did any of the officers read the Defendant her *Miranda* rights.

{¶ 7} "The Defendant remained in the female waiting area for an extended period of time. She was uncomfortable because the room was cold. However, she was fed on three separate occasions and allowed to sleep. The Defendant was then moved to a different housing area within the jail.[1] Approximately forty-five minutes later the Defendant met with Detective Chad Begley ('Begley'). The interview with Begley took place on the second floor near the Defendant's new housing area. Prior to being interviewed, the Defendant was read her *Miranda* rights. In addition to being read those rights, the Defendant initialed a pre-interview form that indicated she understood each of her rights. She also signed the bottom portion of that form, which indicates there were no promises or threats made to her and no pressure or coercion used against her. The Defendant then made statements to Begley about her possession of drugs within the facility. The Defendant now seeks to suppress the statements made and the evidence obtained."

{¶ 8} Defendant was indicted on one count of possession of crack cocaine in an amount between ten and 25 grams, R.C. 2925.11(A), and one count of illegal conveyance of a drug of abuse onto the grounds of a detention facility, R.C. 2921.36(A)(2). Defendant filed a motion to suppress both her statements and the contraband recovered from her because her first custodial interrogation was undertaken without *Miranda* warnings. The trial court overruled defendant's motion to suppress following a hearing. Pursuant to a negotiated plea agreement, defendant entered a plea of no contest to the cocaine-possession charge and was found guilty. In exchange, the state dismissed the illegal-conveyance charge. The trial court sentenced defendant to the mandatory minimum two-year prison term.

{¶ 9} Defendant timely appealed to this court from her conviction and sentence. She challenges only the trial court's decision overruling her motion to suppress.

---

1. This move took place the following morning, at around 10:00 a.m.

ASSIGNMENT OF ERROR

{¶ 10} "The trial court erred in overruling Christine N. Porter's motion to suppress the evidence recovered as a result of the corrections officers interrogating her without the benefit of Miranda warnings."

{¶ 11} Defendant argues that the trial court erred in overruling her motion to suppress because (1) her statements to corrections officers ("COs") at the Montgomery County Jail were the product of a custodial interrogation performed without prior *Miranda* warnings, (2) the *Miranda* warnings provided by Detective Begley the next day were ineffective due to defendant's prior statements to the COs, and (3) defendant's statements to the COs were involuntary because they were coerced by threats. Defendant claims that both her statements and the drugs recovered from her person as a result of her statements were subject to suppression.

{¶ 12} In a motion to suppress, the trial court assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses. *State v. Clay* (1973), 34 Ohio St.2d 250, 63 O.O.2d 391, 298 N.E.2d 137. Accordingly, in our review, we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard. *State v. Retherford* (1994), 93 Ohio App.3d 586, 639 N.E.2d 498.

{¶ 13} In *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the Supreme Court was concerned that the circumstances of custodial interrogation and interrogation techniques police are apt to use may be so overbearing as to render involuntary a suspect's decision to waive his Fifth Amendment privilege against incriminating himself in criminal activity by a confession of guilt. To avoid that difficulty, *Miranda* required a prescribed warning of rights that must precede custodial interrogation, and further held that when those rights are waived by the suspect in custody, any subsequent statement the suspect makes is presumed to be voluntary.

{¶ 14} The *Miranda* presumption applies to the conditions inherent in custodial interrogation that compel the suspect to confess. It does not extend to any actual coercion police might engage in, and the Due Process Clause continues to require an inquiry separate from custody considerations and compliance with *Miranda* regarding whether a suspect's will was overborne by the circumstances surrounding his confession. *Dickerson v. United States* (2000), 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405. Voluntariness of a confession and compliance with *Miranda* are analytically separate inquiries. *State v. Petitjean* (2000), 140 Ohio

App.3d 517, 748 N.E.2d 133; *State v. Chase* (1978), 55 Ohio St.2d 237, 9 O.O.3d 180, 378 N.E.2d 1064. A confession may be involuntary even when *Miranda* warnings are given, or even if *Miranda* warnings are not required. *Dickerson; Petitjean.* We have held that the rule of *Dickerson* renders involuntary a Mirandized confession obtained through false promises of leniency. *Petitjean.*

{¶ 15} The threshold issue that any *Miranda* challenge presents is whether the subject was in custody at all, especially when no formal arrest has yet occurred. That inquiry is obviated when the suspect has been incarcerated for a different offense, because then custody is beyond dispute. Even then, however, *Miranda* warnings must be given before the suspect in custody is interrogated concerning another offense he is suspected of having committed. *Mathis v. United States* (1968), 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381; *State v. Holt* (1997), 132 Ohio App.3d 601, 725 N.E.2d 1155.

{¶ 16} Relying on a distinction that *Miranda* made with respect to "on-the-scene" investigations, courts have created an exception in the limited circumstance in which there is on-the-scene questioning of an inmate about a crime the inmate is suspected of having committed while in the jail or prison facility, holding that *Miranda* warnings in those circumstances need not precede an interrogation. *State v. Holt* (1997), 132 Ohio App.3d 601, 725 N.E.2d 1155; *State v. Schultz* (Sept. 22, 1983), Cuyahoga App. No. 46043, 1983 WL 4749. That exception does not apply, however, when the circumstances of the interrogation create a change in the surroundings of the prisoner that results in an added imposition on his or her freedom of movement. Then, because additional custodial conditions exist, a prior *Miranda* warning must be given before interrogation of the inmate. *Cervantes v. Walker* (C.A.9, 1978), 589 F.2d 424; *United States v. Cooper* (C.A.4, 1986), 800 F.2d 412; *State v. Bradley* (Sept. 22, 1987), Scioto App. No. 1583, 1987 WL 17303; *State v. Swinney* (July 15, 1989), Pickaway App. No. 87CA41, 1989 WL 86260. Whether an inmate is entitled to prior *Miranda* warnings depends on the particular circumstances of each case. *Cooper; Bradley.*

{¶ 17} Cervantes was incarcerated in a county jail. Because of Cervantes's recent involvement in a fight with another inmate, Sheriff's Deputy Jopes moved Cervantes to another cell. Jopes directed Cervantes to get his belongings and then took him to the jail library so Sergeant Ingle could talk with him before the move. Cervantes left his belongings on a table outside the library door. Jopes searched those belongings in accordance with standard jail procedure when moving inmates. Jopes found a small matchbox containing a green substance he suspected was marijuana. Jopes took the matchbox into the library, showed the contents to Cervantes, and asked, "What's this?" Cervantes replied, "That's grass, man." The United States Court of Appeals for the Ninth Circuit held that

this was an instance of on-the-scene questioning that did not require *Miranda* warnings because there was no change in the surroundings of Cervantes that resulted in an added imposition on his freedom of movement over and above that of the normal prison setting. See *Cervantes* (C.A.9, 1978), 589 F.2d 424.

{¶ 18} Cooper was an inmate at a prison in Lorton, Virginia. Cooper assaulted another inmate and a corrections officer in the visitor area of the prison. Ten days later, while a correctional treatment specialist, Adrienne Poteat, was visiting other inmates near defendant's cell, defendant asked to speak with Poteat. Defendant was then moved from his cell to a disciplinary board room to facilitate the conversation. Defendant was not handcuffed. When Poteat asked why defendant had committed the assaults, defendant made incriminating statements. The United States Court of Appeals for the Fourth Circuit held that *Miranda* warnings were not required because the change in Cooper's surroundings did not result in an added imposition on his freedom of movement and therefore he was not "in custody." See *Cooper* (C.A.4, 1986), 800 F.2d 412.

{¶ 19} Bradley was an inmate at the Southern Ohio Correctional Facility in Lucasville, Ohio. Bradley worked in the sheet-metal shop, and while working there one day, Bradley assaulted and killed Eric Bowling, a civilian employee who was the supervisor. Pursuant to standard prison procedures, all inmates in the sheet-metal shop were strip searched. When Bradley was searched, corrections officers noted that he had spots of blood on his shirt and forehead. Deputy Superintendent Seth asked Bradley about the blood on his shirt, what it was and where it had come from. Referring to the fatal assault that had just occurred, corrections officer Taylor asked Bradley, "Did you do that?" Bradley answered, "Yes." Bradley was not handcuffed while being searched and questioned. The Ohio Fourth District Court of Appeals held that *Miranda* warnings were not required because there was no change in the surroundings of Bradley that resulted in an added imposition on his freedom of movement over and above what was normal in the prison setting, and therefore Bradley was not "in custody." See *Bradley*, Scioto App. No. 1583, 1987 WL 17303.

{¶ 20} Swinney was an inmate at Orient Correctional Institute in Columbus, Ohio. A female clerical employee who worked in the health center at the prison reported to Columbus police that she was raped by defendant while working at the prison. Columbus police informed prison officials about the complaint, and chief corrections officer Bucy began an investigation. Bucy had Swinney brought from his cell, handcuffed, to his office, where he questioned Swinney about the rape. Swinney denied any involvement. Swinney was then placed in security control rather than being returned to his cell. Later, Bucy questioned Swinney again in his office about the rape. This time Swinney admitted having sex with the female employee, but he claimed she had consented. The Ohio Fourth

District Court of Appeals held that *Miranda* warnings were required in these circumstances because Swinney suffered an added restriction in his freedom of movement over and above that in his normal prison setting, and therefore he was "in custody." See *Swinney,* Pickaway App. No. 87CA41, 1989 WL 86260.

{¶ 21} In the present case, the trial court found that the corrections officers at the Montgomery County jail were conducting an on-the-scene investigation of a crime that might have been committed inside the jail facility by defendant, who was an inmate. We agree with that assessment. The trial court further found that *Miranda* warnings were not required because the conditions of defendant's interrogation did not create a "significant added imposition on her freedom of movement." The court noted that defendant was questioned in areas that are routinely used by other female inmates, the dressing/shower area off the housing unit for female inmates. However, the record shows that much more than that occurred.

{¶ 22} Defendant was removed from her jail cell and questioned in the area just outside her housing unit. When defendant failed to cooperate with an attempted search of her person, she was handcuffed and moved to the female dressing area. There, defendant's handcuffs were removed, she was questioned further, and two more attempts were made to search her person that defendant resisted. Defendant was again placed in handcuffs while forms authorizing a strip search were completed. Once that procedure was authorized, defendant was returned to the shower area where the handcuffs were removed, and she was made to strip off all her clothes. Defendant was then required to squat naked on the floor and cough, presumably in order to cause whatever she had concealed in her vaginal cavity to be expelled.

{¶ 23} When the strip search and squat-and-cough procedure failed to produce any contraband, defendant was allowed to dress and was further questioned by the housing supervisor, Sergeant Milburn, who informed defendant that he had probable cause to believe she had contraband "up inside of her." Milburn added that he intended to contact a detective in order to secure a search warrant to have a search of defendant's body cavities performed at a hospital, and that "if she would give up the contraband that would end it, but if they found anything at the hospital he'd probably charge her with everything he could think of since she was wasting his time."

{¶ 24} Defendant continued to maintain her innocence, and she was again handcuffed and taken to the female waiting area, where she remained while Milburn left to contact detectives. Milburn had not completed his phone call before defendant asked to speak with him. Milburn then took defendant into the transport office, where she admitted having concealed a baggie inside her and offered to remove it. Defendant was then taken back into the shower area,

where she apologized to corrections officers for lying to them and then removed the crack cocaine from her vaginal cavity.

{¶ 25} The strip-search and squat-and-cough procedures were performed pursuant to jail regulations, to which all inmates are subject. However, in this instance, only defendant was subjected to them. That's to be expected, inasmuch as she was the singular suspect. However, the fact remains that defendant alone was subjected to them. More important, the circumstances of the strip search involved a significant added imposition on the freedom of movement defendant had as a jail inmate, over and above that of the usual jail setting, as well as the additional impositions on personal integrity peculiar to a strip search.

{¶ 26} The issue is not whether additional "impositions" were illegal. The issue is whether they occurred. If they did, then prior *Miranda* warnings are required, the on-the-scene nature of the investigation notwithstanding. On this record, we find that the strip search to which defendant was subjected created an additional imposition on defendant's freedom of movement in relation to the causes of her incarceration, such that *Miranda* warnings were required before any further interrogation took place. Because the warnings were not given, the statements defendant subsequently made to corrections officers at the jail must be suppressed, along with the illegal drugs police recovered from defendant's person as a direct result of the incriminating statements defendant made while in custody. *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985.

{¶ 27} After defendant removed the drugs from her vaginal cavity and turned them over to corrections officers at the jail, defendant was returned to the female waiting area where she was kept overnight instead of being returned to her cell. The next morning, defendant was moved to a different housing area in the jail. Shortly thereafter, defendant met with Detective Chad Begley in an interview room on the second floor of the jail. Detective Begley advised defendant of her *Miranda* rights, which defendant indicated she understood and was willing to waive. Detective Begley then questioned defendant about her possession of drugs in the jail the night before, which resulted in defendant's making incriminating statements.

{¶ 28} Defendant argues that the *Miranda* warnings given to her by Detective Begley, after she had already given an unwarned confession the day before, were ineffective to fulfill their purpose, and therefore her incriminating statements to Begley were inadmissible, citing *Missouri v. Seibert* (2004), 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643. The Ohio Supreme Court followed and applied *Seibert* in *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985. The situation surrounding defendant's statements, however, is factually distinguishable from the circumstances present in *Seibert*.

{¶ 29} In *Seibert,* during one nearly continuous interrogation, police deliberately employed a "question first, warn later" strategy, effectively dividing the interrogation into two parts. First, police questioned defendant until they obtained a confession, intentionally failing to give *Miranda* warnings. After a brief break, the same officer then advised defendant of her *Miranda* rights, obtained a signed waiver, and then continued questioning defendant, confronting her with her prewarning statements until defendant repeated her earlier confession. The Supreme Court upheld the suppression of the second confession as a finding that giving *Miranda* warnings midway through the interrogation session, after a confession, was ineffective to fulfill their purpose. That is not the situation here.

{¶ 30} Defendant Porter was subjected to two separate interrogations, not a single, continuous interrogation. Defendant was questioned by corrections officers and Sergeant Milburn in the female dressing- and shower-room areas of the jail at around 4:45 p.m. on December 4, 2006. That questioning ended by 5:00 p.m. Defendant was not questioned again until 10:00 a.m. on December 5, 2006, 17 hours after the initial questioning. A different officer, Detective Begley, conducted that second questioning in a different location, an interview room on the second floor of the jail. Between the two interrogation sessions, defendant ate and slept.

{¶ 31} Begley's interview of defendant the following day cannot reasonably be viewed as a mere continuation of the earlier questioning by the corrections officers and Sergeant Milburn the night before. Furthermore, there is no suggestion of a planned and deliberate effort by law-enforcement officers to first obtain an unwarned confession from defendant and then exploit that confession to induce defendant to waive her rights and repeat her earlier unwarned confession. Under those circumstances, *Seibert* is factually distinguishable and does not control the outcome in this case. *State v. Baccus,* Montgomery App. No. 21025, 2006-Ohio-771, 2006 WL 401271.

{¶ 32} The general rule is that a failure to administer *Miranda* warnings before obtaining an incriminating statement does not fatally taint any subsequent statements that are preceded by *Miranda* warnings and a valid waiver of those rights, provided that both the prior and the subsequent statements were voluntarily made. *Oregon v. Elstad* (1985), 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222; *State v. Baccus,* supra. The issue presented is whether defendant's incriminating statements one day before were involuntary, rendering her *Miranda* waivers the following day ineffective.

{¶ 33} Defendant argues that the circumstances surrounding the giving of her confession overbore her will to resist confessing. Specifically, defendant claims that her confession to Sergeant Milburn was coerced by Milburn's threat of

adverse consequences if defendant did not incriminate herself. Milburn told defendant that "if she would give up the contraband that would end it," but if they found anything at the hospital during a body-cavity search Milburn said he was going to have performed on defendant, he'd "probably charge her with everything he could think of since she was wasting his time."

{¶ 34} Admonitions to tell the truth, coupled with a benefit that flows naturally from being truthful, are not coercive in nature. *State v. Hopfer* (1996), 112 Ohio App.3d 521, 679 N.E.2d 321. On the other hand, if a suspect is told that he might then reasonably expect specific, more lenient treatment in consideration of making a statement, the motivation involved renders a statement the suspect makes involuntary. *State v. Petitjean,* 140 Ohio App.3d 517, 748 N.E.2d 133 Then, an incriminating statement is forced from the mind of the suspect by the flattery of hope or by the torture of fear, and must be suppressed because it was involuntary. Id.; *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405.

{¶ 35} Defendant was not presented with some benefit she could obtain by confessing. Instead, she was threatened with severe adverse consequences if she did not and some illegal substance was later found on her person. The inducement was not a positive benefit, but avoidance of a particular detriment. We see no difference for purposes of defendant's resulting waiver of her Fifth Amendment right.

{¶ 36} The state argues that defendant forfeited her right to argue this issue of actual coercion on appeal because she failed to raise it in the trial court in either her motion to suppress, at the hearing at that motion, or in her posthearing memorandum. Failure to put the prosecutor and the court on notice of an issue to be decided in relation to a legal objection a defendant has raised forfeits a defendant's right to raise the issue on appeal. *Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 524 N.E.2d 889; *State v. Shindler* (1994), 70 Ohio St.3d 54, 636 N.E.2d 319.

{¶ 37} In *State v. Payne,* 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 15–17, the Supreme Court wrote:

{¶ 38} "Typically, if a party forfeits an objection in the trial court, reviewing courts may notice only '[p]lain errors or defects affecting substantial rights.' Crim.R. 52(B). Inherent in the rule are three limits placed on reviewing courts for correcting plain error.

{¶ 39} " 'First, there must be an error, *i.e.,* a deviation from the legal rule. * * * Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * * Third, the error must have affected "substantial rights." We have

interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial.' *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. Courts are to notice plain error 'only to prevent a manifest miscarriage of justice.' *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus.

{¶ 40} "The burden of demonstrating plain error is on the party asserting it. See, e.g., *State v. Jester* (1987), 32 Ohio St.3d 147, 150, 512 N.E.2d 962. A reversal is warranted if the party can prove that the outcome 'would have been different absent the error.' *State v. Hill* (2001), 92 Ohio St.3d 191, 203, 749 N.E.2d 274."

{¶ 41} We believe that the trial court's denial of defendant's motion to suppress evidence was plain error. Failure to suppress incriminating statements a defendant makes that are the product of coercion by law-enforcement officers is error. The error is obvious; the court found that Sergeant Milburn made the threat, and it is undisputed that defendant confessed directly thereafter. Further, the error affected defendant's substantial rights; absent her confession and the evidence she yielded up, defendant could not have been charged with and convicted for these drug-related offenses. Therefore, we are not prevented from noticing the error on appeal.

{¶ 42} Lastly, the state argues that even if this court finds that defendant's incriminating statements to CO Matlock, Sergeant Milburn, and Detective Begley should have been suppressed, the drugs recovered from defendant's person are nevertheless admissible because they would inevitably have been discovered apart from the unlawful conduct, as a result of the body-cavity search for which Sergeant Milburn requested a warrant. According to the state, that lawful investigative procedure had already been set in motion because Sergeant Milburn was in the process of calling detectives to get a search warrant when defendant asked to speak to him and ultimately confessed that she had drugs concealed on her person. *Nix v. Williams* (1984), 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377; *State v. Perkins* (1985), 18 Ohio St.3d 193, 18 OBR 259, 480 N.E.2d 763.

{¶ 43} In order for the inevitable-discovery doctrine to apply, investigative procedures independent of the illegal conduct that would have ultimately led to the inevitable discovery of the evidence must be in place and implemented prior to the discovery of the evidence by illegal means. *State v. Masten* (Sept. 29, 1989), Hancock App. No. 5–88–7, 1989 WL 111983; *State v. Pearson* (1996), 114 Ohio App.3d 153, 682 N.E.2d 1077. In other words, the state must show that police were actively pursuing an alternate line of investigation, one untainted by the illegality that took place prior to the particular misconduct. *State v. Taylor*

(2000), 138 Ohio App.3d 139, 740 N.E.2d 704.   Otherwise, the inevitable-discovery doctrine would apply even if police merely "could have discovered" the evidence, rather than if they "would have discovered" it, which is the showing the inevitable-discovery exception requires. *Pearson.*

{¶ 44} The illegal conduct in this instance was Detective Milburn's threat that if defendant did not cooperate and a body-cavity search yielded contraband, he would "probably charge her with everything he could think of since she was wasting his time" by refusing to cooperate.   That illegal conduct occurred prior to the telephone call to a detective that Milburn made in order to obtain a warrant for a body-cavity search, a call that Milburn terminated because defendant agreed to cooperate in response to Milburn's threat.   Because defendant's agreement was a product of the prior illegal threat, and because Milburn abandoned the "alternative line of investigation" when defendant agreed to cooperate, the inevitable-discovery doctrine does not apply.   To hold otherwise would allow law enforcement officers to exploit their own illegal conduct in order to engage in an "alternative line of investigation."

{¶ 45} Defendant's assignment of error is sustained.   The judgment of the trial court overruling defendant's motion to suppress her statements to CO Matlock, Sergeant Milburn, and Detective Begley, as well as the drugs recovered from her person, is reversed.   This cause is remanded to the trial court for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

FAIN and DONOVAN, JJ., concur.