[Cite as *State v. Brown*, 2018-Ohio-4448.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27820 |
| | : | |
| v. | : | Trial Court Case No. 17-CR-1385 |
| | : | |
| QUENTIN L. BROWN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of November, 2018.

. . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

JOHN S. PINARD, Atty. Reg. No. 0085567, 120 W. Second Street, Suite 603, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Quentin L. Brown was found guilty by a jury in the Montgomery County Court of Common Pleas of two counts of felony murder, two counts of felonious assault, two counts of aggravated robbery, and one count of improper handling of a firearm in a motor vehicle; the felony murder, felonious assault, and aggravated robbery counts each contained a firearm specification. The trial court also found Brown guilty, after a bench trial, of two counts of having weapons while under disability. After merging several counts and specifications, the trial court sentenced Brown to an aggregate 24 years to life in prison.

{¶ 2} Brown appeals from his convictions, claiming that the trial court erred in failing to suppress statements that he made to the police and that his convictions were against the manifest weight of the evidence. For the following reasons, the trial court's judgment will be affirmed.

## I. Manifest Weight of the Evidence

{¶ 3} In his second assignment of error, Brown claims that his convictions were against the manifest weight of the evidence.

{¶ 4} "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving

conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 5} In reviewing challenges based on the manifest weight of the evidence, we are required to consider all of the evidence admitted at trial, regardless of whether it was admitted erroneously. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284; *State v. Rosales*, 2d Dist. Montgomery No. 27117, 2018-Ohio-197, ¶ 16, citing *State v. Johnson*, 2015-Ohio-5491, 55 N.E.3d 648, ¶ 95 (2d Dist.).

{¶ 6} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 7} At trial, the State presented the testimony of 16 witnesses and offered 96 exhibits. The defense offered no witnesses, but offered 5 exhibits. The evidence at trial established the following facts.

{¶ 8} Shortly before 5:30 p.m. on November 26, 2016, Benjamin Werner went to Miami Valley Gaming and Casino in Lebanon, Ohio. A little more than an hour later, as Werner was leaving the casino's parking lot, Werner stopped next to a Ford F350 owned by Matthew Bader and stole an iPad mini and a black Springfield Armory XDM Series 3.8

compact semi-automatic pistol from Bader's truck; Bader had personalized the gun with a tacky grip and pink rear sights. Bader reported the theft to the casino and to the Warren County Sheriff's Office. Upon reviewing surveillance video from the casino parking lot and inside the casino, a surveillance investigator at the casino was able to identify Werner as the potential perpetrator of the theft.

{¶ 9} At approximately 7:00 p.m., Cameron Redd and Brown drove to a United Foods store on North Main Street in Dayton. Redd, who was driving his mother's silver Honda Civic, backed into a parking space. Soon thereafter, Werner pulled into an adjacent parking space so that his driver's window was next to Redd's driver's window. Brown got out of Redd's vehicle, walked to Werner's vehicle (a gold Honda Civic), and spoke with Werner. Brown then went into the store, bought a drink, and returned to Redd's vehicle. Brown told Redd that Werner was trying to sell a gun. Redd testified that Brown borrowed $150 from him to purchase the gun and that Brown intended to sell the gun to someone else. Surveillance video from United Foods, which a Dayton police officer subsequently obtained, showed Redd's and Werner's actions in the parking lot and Werner's purchase of a beverage from the store.

{¶ 10} According to Redd, Brown directed him to drive from the United Foods parking lot and park on Wheatley Avenue, near the intersection with West Norman Avenue. Werner followed in his vehicle and stopped in front of Redd's car. Brown then exited Redd's Civic and got into Werner's Civic. Werner drove westward along an alley north of West Norman Avenue; Redd followed in his vehicle. Brown then got out of Werner's car and told Redd to "go around the car because the guy wouldn't sell him the gun unless [Redd] left." Redd drove down the alley and parked on Cherry Drive, one

block west of Wheatley Avenue. He could see Werner move into a parking spot behind a house.

{¶ 11} Redd testified that he had waited in his vehicle for about seven minutes when he heard multiple gunshots. Kevin Kerley, who lived on West Norman Avenue, also heard "quite a few" gunshots and saw an unfamiliar car parked behind the vacant house next door. Kerley called 911 and then watched from an upstairs window that faced the alley.

{¶ 12} Upon hearing the gunshots, Redd drove eastbound down the alley (toward Wheatley) and saw Brown walking on West Fairview Avenue, which was the next street north of the alley. Brown saw Redd's car and met Redd at the end of the alley. Brown got into the car, gave Redd his money back, and told Redd to drive back to Werner's vehicle. Upon reaching Werner's Civic, Brown got out, and Redd drove to the west end of the alley, made a U-turn, and parked facing eastbound partway down the alley. Redd stated that he could not see what Brown was doing, but Brown did not return to Redd's vehicle. Soon after, Redd saw another vehicle approaching from the opposite direction. Redd began to drive away, but the oncoming vehicle was a police cruiser. Redd was stopped and detained; the police took Redd's phone while Redd was seated in a cruiser. During the evening, Redd missed several calls and messages from "Deadhead QC," who Redd identified as Brown.

{¶ 13} The police began investigating the "shots fired" report and spoke with Kerley. Kerley informed the police that he had called 911 and that an unfamiliar vehicle was behind the vacant home next to his home. At trial, Kerley testified that, while looking out his upstairs bathroom window, he saw a car head west down the alley, turn around

and travel eastward back down the alley. The car stopped behind another vehicle, which was parked in a yard, and the car turned off its headlights. A passenger exited the car, but the driver did not get out; Kerley could see that the car's brake lights remained illuminated. Kerley observed the passenger walk up to the other parked vehicle, get in, and activate the second vehicle's brake lights. Kerley could not see the passenger's face, but testified that the individual was wearing "some type of dark hoodie." Soon thereafter, Kerley saw another set of headlights, which were from a police vehicle, heading westward up the alley. Kerley saw the car start up and begin to drive toward the oncoming police vehicle; Kerley did not see the passenger return to the car prior to the police's arrival.

{¶ 14} Shortly into their investigation of the "shots fired" report, Werner's vehicle was located behind a vacant house next to Kerley's. Officers saw Werner lying facedown, deceased, by the front passenger-side tire. Werner had died from multiple gunshot wounds.

{¶ 15} During their investigation of the scene, the police located six 9mm bullet casings: one on the trunk of Werner's Honda, two on the ground near Werner's Honda, and three in the front passenger seat of Werner's Honda. A holster, which Bader identified at trial as his, was found in the alley. No gun was found at the scene. Both Redd's car and Werner's car were towed to the police garage. A Dayton evidence technician later located a spent bullet inside the driver's door of Werner's vehicle. An iPad mini, which Bader identified at trial as his, was located on the front passenger floorboard of Werner's car.

{¶ 16} Several hours after the shooting, homicide detectives interviewed Redd at

the police station. Redd testified at trial that he lied to the police during this interview because he did not want to be a "snitch." The detectives looked at Redd's phone with Redd's consent. After seeing Brown's messages, the detectives identified "Deadhead QC" as Brown and found a cell phone number for him. The detectives asked Redd to call Brown back to see if Brown would make statements related to the murder; Brown told Redd that they would talk in person. The detectives did an "exigent circumstance ping" of Brown's phone through the cell phone company in an attempt to locate Brown; the location was a residential area, and the detectives did not attempt to apprehend him at that time.

{¶ 17} At approximately 10:00 a.m. on the day following the shooting (November 27), the detectives did another "ping" of Brown's phone, which indicated that Brown was located at a BP gas station. Homicide detectives went to that location and found Brown in the rear seat of a vehicle driven by his sister. Two guns were located inside the sister's vehicle: a .22 caliber long rifle semiautomatic handgun and Bader's .40 caliber black Springfield Armory XDM. Neither gun was the murder weapon.

{¶ 18} Homicide detectives Thomas Cope and Brad Daugherty interviewed Brown twice at the police station. During the first interview, which lasted approximately 34 minutes, Brown initially told the detectives that he had been with his sister and later his girlfriend on November 26, 2016. He stated that he did not have a cell phone or a Facebook page, and that he communicated using other individuals' accounts. When asked when he had last seen Redd, Brown responded that he had been with Redd earlier on November 26 in a red rental truck. Upon being confronted with some of the evidence that the detectives had obtained, Brown admitted to going to United Foods with Redd and

to being in the relevant area. The detectives played for Brown a recording of their interview with Brown's sister, in which the sister indicated that Brown had told her that he had "caught a murder." Brown continued to deny that he was involved in a homicide. The detectives terminated the interview, placed Brown under arrest, and put him in a holding room pending his being taken to jail.

{¶ 19} About ten minutes later, Brown informed an officer that he wanted to speak with the detectives again. Detective Daugherty and another detective took Brown back into an interview room. Brown told the detectives that he "wanted to tell [them] the truth this time." Brown told the detectives that he was in the alley with Redd, but Redd was responsible for the murder. Brown stated that Redd used a 9mm Glock. Brown claimed that he had left Redd's car and was on a nearby street when he heard the gunshots.

{¶ 20} Later that day, after being assaulted by two individuals who had been with Redd and Brown during the afternoon of November 26, Redd again spoke with detectives. After the detectives "kept catching [him] in lies," Redd eventually told them what happened consistent with his trial testimony.

{¶ 21} The Miami Valley Regional Crime Lab tested the holster and six casings for touch DNA. No DNA was found on the casings, and Brown was excluded as the source of DNA from the holster.

{¶ 22} Brown claims that his convictions were against the manifest weight of the evidence, because there was minimal evidence that he was responsible for the shooting. Brown emphasizes that he was not found at the crime scene, only one witness (Redd) placed him at the crime scene at the time of the murder, Redd was not credible, no DNA tied him to the murder, and no murder weapon was found. Brown further emphasizes

that Kerley indicated that the murderer was wearing "some type of dark hoodie," and that video footage from United Foods and Redd's testimony established that Brown was not wearing a hoodie.

{¶ 23} Although no one witnessed the shooting itself, a defendant may be convicted based solely upon circumstantial evidence, because circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 482 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988); *State v. Bennett*, 2d Dist. Montgomery No. 24576, 2012-Ohio-194, ¶ 11. In fact, in some cases, "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson*, 57 Ohio St.3d 29, 38, 565 N.E.2d 549 (1991).

{¶ 24} In this case, there was substantial, albeit circumstantial, evidence that Brown shot Werner in the alley between West Norman Avenue and Fairview Avenue. First, there was substantial evidence that Werner, the victim, stole an iPad mini and a black Springfield Armory XDM Series 3.8 compact semi-automatic pistol from Bader's truck when Bader was at Miami Valley Gaming and Casino. When Werner's vehicle was found after the shooting, Bader's iPad mini remained in Werner's vehicle.

{¶ 25} Surveillance video from United Foods, Redd's testimony, and Brown's statements to detectives during the second interview all indicated that Redd, Brown, and Werner were at the United Foods, and that they left together. Redd testified that Brown arranged to purchase a gun from Werner, and that Brown and Werner met in the alley. Redd testified that he was waiting in his vehicle near the alley when he heard gunshots, and Redd described how he had driven down the alley, met up with Brown, made a U-turn, and parked. Kerley, who was watching out of his window after the shooting,

corroborated the movements of Redd's vehicle; Kerley's testimony also indicated that the driver of Redd's vehicle did not exit his car. Redd was detained by the police in the alley; no gun was found. Although Redd told multiple versions of the events to detectives following the shooting, the jury could have reasonably determined that Redd testified truthfully at trial.

{¶ 26} Brown was located the next day in a vehicle with Bader's gun. The fact that Brown was in possession of Bader's gun, which had been taken by Werner, was additional circumstantial evidence that Brown (and not Redd) had entered Werner's vehicle. Kerley testified that the person who entered Werner's vehicle appeared to be wearing a hooded sweatshirt, but Kerley indicated that he only saw the person from the back. Although the United Foods video showed that Brown was not wearing a hooded sweatshirt, the jury could have reasonably concluded that Kerley was simply mistaken in that description, given that it was nighttime, the back of Brown's jacket was black, and Brown had dark dreadlocks on the night of the shooting.

{¶ 27} In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28. It was the province of the jury to weigh the evidence and determine whether the State had proven, beyond a reasonable doubt, that Brown had committed the charged offenses. Upon review of the entire record, the jury did not lose its way in finding Brown guilty of murder and the other charged offenses.

{¶ 28} Brown's second assignment of error is overruled.

### III. Voluntariness of Brown's Statements to the Police

{¶ 29} In his first assignment of error, Brown claims that the statements he made to the police were involuntary and should have been suppressed.

{¶ 30} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 31} Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself or herself. In order to ensure that this right is protected, statements resulting from custodial interrogations are admissible only after a showing that the procedural safeguards described in *Miranda v. Arizona*, 384 U.S. 436, 87 S.Ct. 1602, 16 L.Ed.2d 694 (1966), have been followed. *State v. Earnest*, 2d Dist. Montgomery No. 26646, 2015-Ohio-3913, ¶ 21.

{¶ 32} Whether a statement was made voluntarily and whether an individual knowingly, voluntarily, and intelligently waived his or her *Miranda* rights are distinct issues. *State v. Eley*, 77 Ohio St.3d 174, 178, 672 N.E.2d 640 (1996); *State v. Givens*, 2d Dist. Montgomery No. 26782, 2016-Ohio-4978, ¶ 22. Regardless of whether *Miranda* warnings were required and given, a defendant's statement may have been given involuntarily and thus be subject to exclusion. *Kelly*, 2d Dist. Greene No. 2004-CA-20,

2005-Ohio-305, at ¶ 11.

{¶ 33} A defendant's statements to police after a knowing, intelligent, and voluntary waiver of the individual's *Miranda* rights are presumed to be voluntary. *Miranda*. "The *Miranda* presumption applies to the conditions inherent in custodial interrogation that compel the suspect to confess. It does not extend to any actual coercion police might engage in, and the Due Process Clause continues to require an inquiry separate from custody considerations and compliance with *Miranda* regarding whether a suspect's will was overborne by the circumstances surrounding his confession." *State v. Porter*, 178 Ohio App.3d 304, 2008-Ohio-4627, 897 N.E.2d 1149, ¶ 14 (2d Dist.), citing *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

{¶ 34} "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *overruled on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978). A defendant's statement to police is voluntary absent evidence that his will was overborne and his capacity for self-determination was critically impaired due to coercive police conduct. *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); *State v. Otte*, 74 Ohio St.3d 555, 562, 660 N.E.2d 711 (1996).

{¶ 35} In general, the State has the burden to show by a preponderance of the evidence that a defendant's confession was voluntarily given. *State v. Melchior*, 56 Ohio St.2d 15, 381 N.E.2d 195 (1978).

{¶ 36} Detectives Daugherty and Cope first interviewed Brown at the Dayton Safety Building, beginning at around 12:53 p.m. on November 27, 2016. At the suppression hearing, Daugherty testified that Brown did not appear to be under the influence of drugs or alcohol, he appeared to understand what was going on, and he responded to questions appropriately. Brown was 17 years old and had completed 10 years of schooling. Det. Cope's statements to Brown during the interview indicated that Brown had previously been involved with the criminal justice system. Both interviews were audio- and video-recorded, and we have reviewed those recordings.

{¶ 37} At the beginning of the first interview, Det. Cope told Brown that, because he was detained, the officers needed to provide him *Miranda* rights. Det. Cope reviewed Brown's *Miranda* rights using the Dayton police's standard pre-interview form; Brown indicated that he understood his rights and initialed the form. Brown agreed to speak with the detectives; Brown did not, at any time, request an attorney. At one point in the interview, when Cope asked Brown if he would provide a DNA sample, Brown declined, saying he would not give a DNA sample without an attorney.

{¶ 38} Det. Cope questioned Brown about his activities on November 26 and about contact information for Brown and his girlfriend. Brown then recounted a version of his movements on November 26 that was inconsistent with what the detectives had learned. Det. Cope confronted Brown with information demonstrating that the detectives had his correct cell phone number, Facebook information, and phone records. Cope told Brown that the "jig is up" and that Brown needed to tell them what happened.

{¶ 39} Brown then admitted to going to United Foods with Redd and to being near the murder location. Brown denied that he was involved in a homicide and told the

detectives that he had gotten out of Redd's car and gone to his girlfriend's house. The detectives and Brown spoke for several minutes about the route Brown had taken.

**{¶ 40}** Det. Cope informed Brown that detectives had interviewed Brown's sister and that she had told the detectives that Brown had said that he "caught a murder." Det. Daugherty played the portion of a recording of Brown's sister's interview in which she had told detectives what Brown had said. Brown denied that he was involved in a homicide, saying "I don't know what you're talking about."

**{¶ 41}** Brown repeatedly asked the detectives what evidence they had. Cope told Brown that they had "two witnesses from an upstairs bedroom," Brown's confession to his sister, phone records, and Redd's statements. Brown denied that he knew the victim or had been in the victim's car. At this juncture, the interview became somewhat argumentative. Cope repeatedly told Brown about what the detectives knew happened, and Brown repeatedly argued that the detectives lacked evidence against him. Toward the end of the interview, after again reciting the evidence that the detectives had, Cope said, "It's impossible to argue with a moron * * * because you won't even listen to reason." The detectives and Brown discussed why Brown did not want to submit a DNA swab, and the detectives again mentioned the evidence against Brown. The detectives told Brown what charges he would be arrested on, and they terminated the interview.

**{¶ 42}** Ten minutes after the initial interview concluded, Brown requested to speak with detectives again. Det. Daugherty and another detective, Melissa Schloss, returned Brown to an interview room, and Brown stated that he wanted to tell them the truth. During this interview, Brown denied that he had murdered anyone, and he stated that Redd had shot the victim. Det. Daugherty told Brown that he (Brown) was "not doing

[himself] any favors" and that Brown needed to tell the truth. Daugherty told Brown that Redd did not shoot Werner and that Brown was "digging [himself] a hole" by "trying to throw [Redd] under the bus." Daugherty told Brown that he (the detective) would need to go to a prosecutor and tell the prosecutor whether Brown "didn't mean for it to go down this way" or whether Brown was a "cold-blooded killer."

{¶ 43} Daugherty told Brown about another 17-year-old, arrested two weeks earlier, who had shot and killed someone. Daugherty indicated that the other teen "didn't mean for it to go down that way" and did not know the gun was loaded. Daugherty told Brown that the other teen was honest with the police and told the police who had provided him (the teen) with the gun. Daugherty indicated that the teen was treated more leniently due to his cooperation. Daugherty told Brown that he (Daugherty) could not help Brown unless Brown were honest. Daugherty told Brown that he was going to "do time regardless," because Brown did kill someone, but that Brown's cooperation could affect the amount of time that Brown would serve. Brown continued to deny that he had committed the murder.

{¶ 44} Det. Daugherty told Brown that Redd could not have committed the murder, and Daugherty described some of the evidence the detectives had. Det. Schloss told Brown that his DNA would be found in the victim's car. Brown continued to blame Redd for the shooting and claim that he (Brown) had left the scene before the shooting occurred. The second interview ended when Brown asked to speak to an attorney. The second interview had lasted approximately 22 minutes.

{¶ 45} Brown asserts several reasons why his statements were involuntary. First, he argues that both of his interviews were "littered" with threats. He states that Det.

Daugherty "constantly references [Brown] going to jail for the rest of his life." Second, Brown asserts that detectives made false promises to him. He claims that the detectives implied to him that he would be released if he told the officers what they wanted to hear and that the detectives referenced another case where a defendant who cooperated received better treatment. Brown further emphasizes that he was a juvenile when the offenses occurred, he had not graduated high school, and that the detectives insulted him and lied to him during the interview.

**{¶ 46}** We find nothing in the first interview to indicate that Brown's statements were involuntary. The detectives made no threats, promises, or any other coercive statements at any point in the interview. Det. Cope may have exaggerated some of the evidence against Brown, but we find nothing to suggest that the detective's statements overbore Brown's will. The record thus supports the trial court's conclusion that Brown's statements in the first interview were voluntarily made.

**{¶ 47}** Upon reviewing the recording the second interview, we also cannot conclude that Brown's will was overborne by the detectives' statements. Admonitions to tell the truth are not unduly coercive. *State v. Cooey*, 46 Ohio St.3d 20, 28, 544 N.E.2d 895 (1989); *State v. Knight*, 2d Dist. Clark No. 2004 CA 35, 2008-Ohio-4926. A police officer's assertions to the suspect that he or she is lying or that the suspect will not have another chance to tell his or her side of the story do not automatically render a confession involuntary. *Knight* at ¶ 111. "Similarly, assurances that a defendant's cooperation will be considered or that a confession will be helpful do not invalidate a confession." *State v. Stringham*, 2d Dist. Miami No. 2002-CA-9, 2003-Ohio-1100, ¶ 16. Even a "mere suggestion that cooperation may result in more lenient treatment is neither misleading

nor unduly coercive, as people 'convicted of criminal offenses generally are dealt with more leniently when they have cooperated with the authorities.' " *Id.*, quoting *State v. Farley*, 2d Dist. Miami No. 2002-CA-2, 2002-Ohio-6192; *State v. Strickland*, 2d Dist. Montgomery No. 25545, 2013-Ohio-2768, ¶ 19.

**{¶ 48}** Contrary to Brown's assertions, the interview with Brown was not "littered" with threats, nor did Det. Daugherty "constantly reference[ ]" that Brown would go to jail for the rest of his life.   While Daugherty suggested that Brown might receive more lenient treatment if he (Brown) were to describe the circumstances of what occurred, Brown did not, in fact, confess to the shooting in response to that or any other statement. Accordingly, the trial court did not err in concluding that Brown's statements were made voluntarily.

**{¶ 49}** Brown's first assignment of error is overruled.

### IV. Warrantless Pinging

**{¶ 50}** In his appellate brief, Brown stated that he wished to reserve the right to supplement his brief pending the outcome of *Carpenter v. United States*, which was then-pending before the United States Supreme Court.   Brown stated that the issue involved the detectives' pinging of Brown's cell phone to determine his location on November 26-27, 2016.   Brown has not, in fact, moved to file a supplemental brief on this issue.

**{¶ 51}** At the outset, Brown's motion to suppress was limited to the voluntariness of his statements to the police.   Accordingly, Brown has waived any argument for appeal regarding the detectives' used of cell phone location information.   Moreover, in the absence of an assignment and briefing by the parties, we decline to address whether *Carpenter v. United States*, __ U.S. __, 138 S.Ct. 2206, 201 L.Ed.2d 507 (2018), which

concerned the government's acquisition of cell-site location information cataloging 12,898 historical location points for Carpenter over 127 days, is applicable here, where the detectives twice pinged Brown's phone in order to locate him.

### V. Conclusion

**{¶ 52}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck
Heather N. Jans
John S. Pinard
Hon. Gregory F. Singer